Southwick W. BRIGGS and Stone Filter Company, Incorporated, Plaintiffs,

v.

M & J DIESEL LOCOMOTIVE FILTER CORP. et al., Defendants.

Civ. A. Nos. 62 C 1434, 62 C 1436, 62 C 1921.

United States District Court
N. D. Illinois, E. D.
March 27, 1964.

Mason, Kolehmainen, Rathburn & Wyss, Walther E. Wyss, Robert L. Rohrback, Chicago, Ill., for plaintiffs.

Wolfe, Hubbard, Voit & Osann, Edward W. Osann, Jr., Phillip H. Mayer, Chicago, Ill., for defendants.

JULIUS J. HOFFMAN, District Judge.

This is a patent infringement action originally brought as three separate actions which were consolidated for trial. Plaintiffs allege infringement of two patents, Nos. 2,395,449 and 2,919,807, granted respectively on February 26, 1946, and January 5, 1960, in the name of Southwick W. Briggs, one of the plaintiffs. Patent No. 2,395,449 expired on February 26, 1963; patent No. 2,919,807 is still in force. Plaintiffs specifically allege infringement of claims 9, 10, 11, and 12 of patent No. 2,395,449 (hereinafter abbreviated to '449) and claims 4, 6, 8, 9, 10 and 11 of patent No. 2,919,807 (hereinafter abbreviated to '807). Both of these patents are directed to the oil filtration field, and specifically to filters using a pleated filter element. Defendants deny infringement of both patents and contend that both patents are invalid.

Civil Action No. 62 C 1434, filed July 23, 1962, Civil Action No. 62 C 1436, filed July 23, 1962, and Civil Action No. 62 C 1921, filed October 15, 1962, were consolidated for trial on January 23, 1963, inasmuch as the same plaintiffs and the same patents are involved in the three actions, and the accused structures manufactured and/or sold by the various defendants for the purposes of this litigation are substantially identical.

Plaintiff Southwick W. Briggs is a resident of Chevy Chase, Maryland, and is

the named inventor in both patents in suit and is the owner of both patents.

Plaintiff Stone Filter Company, Incorporated, is a corporation of Maryland, formed on March 31, 1959, and has a regular and established place of business in the Branchville section of College Park, Maryland. Stone is, and has been since its inception, engaged in the business of manufacturing and selling pleated paper lubricating oil filters for diesel locomotives under license from Briggs. Stone holds an exclusive license, subject to a nonexclusive license to a third party, under the '449 patent; Stone is the exclusive licensee under the '807 patent.

Defendant M & J Diesel Locomotive Filter Corporation is an Illinois corporation organized in 1946 and has a regular and established place of business in Chicago, Illinois, within the Northern District of Illinois. The corporation is, and has been since its inception, engaged in the manufacture and sale of railroad equipment and supplies, including cotton waste lubricating oil filters for diesel locomotives. Since March, 1961, M & J has been engaged in the sale of pleated paper lubricating oil filters for diesel locomotives, the accused structures in this litigation. It does not itself manufacture the accused structures, but acquires them from defendant Allied Filter Engineering, Inc.

Defendant Robert W. McNeily is a resident of Western Springs, Illinois, and is president of M & J as well as president of Allied Filter Engineering, Inc.

Defendant Superior Diesel Filter Company is a partnership organized in 1953 and has a regular and established place of business and a manufacturing plant in Chicago, Illinois, within the Northern District of Illinois. At the time this action was brought, the partners in Superior were defendants Barbara A. Giacobbe (nee Bair), Clara A. Bair, Irwin R. Bair, and Dorothy Bair Nichols. The partnership is, and has been since its inception, engaged in the manufacture and sale of railroad equipment and supplies, including cotton waste type lubricating oil filters for diesel locomotives.

Since March, 1961, it has been engaged in the sale of pleated paper lubricating oil filters for diesel locomotives—the accused structures in this litigation. Superior does not itself manufacture the accused structures but acquires them from defendant Allied.

Defendant J. R. McGrath was formerly a partner in Superior.

Defendant Stanley G. Bair was formerly a partner in Superior and founded Superior in 1953. The evidence shows that he has authority over personnel in Allied, Superior, and M & J.

Defendant Allied Filter Engineering, Inc., is an Illinois corporation organized in August, 1960, and has a regular and established place of business in Chicago, Illinois and a manufacturing plant at Franklin Park, Illinois, within the Northern District of Illinois. The corporation is, and has been since its inception, engaged in the business of manufacturing and selling to defendants M & J and Superior pleated paper lubricating oil filters for diesel locomotives.

M & J and Superior have common ownership and a common source of manufacture of the accused structures. M & J, Superior, and Allied are closely interrelated companies having common control at the top and share common office space.

The court has jurisdiction of the parties and of the subject matter.

PLAINTIFFS' RIGHT TO SUE

Defendants contend that neither Southwick W. Briggs nor Stone Filter Company has the right to sue for infringement of the '807 patent. The parties agree that plaintiffs have the burden of establishing their right to bring this action.

It is undisputed that Briggs is, and since the respective dates of issuance has been, owner of both the '449 and the '807 patents. By an agreement of January 4, 1957, Briggs granted to Stone Paper Tube Company an exclusive license under the '449 patent, subject only to a nonexclusive license previously granted by Briggs to the Briggs Filtration Com-

pany. Briggs further granted to Stone, in this agreement, an exclusive license on all his inventions made within a period of ten years from the date of the agreement. Subsequently, Stone Paper Tube was merged with the parent corporation, Stone Straw Corporation of Washington, D. C. Stone Straw manufactured pleated paper filters under the license of January 4, 1957, until March 31, 1959, when Stone Filter Company, plaintiff, was formed as a subsidiary of Stone Straw to manufacture and sell pleated paper filters for diesel locomotives under the January 4, 1957, agreement with Briggs.

It is clear that if only the 1957 agreement is considered, the '449 and '807 patents fall within its terms and consequently both Briggs and Stone have the right to sue for their infringement.

Defendants assert, however, that the '807 patent falls within the terms of an earlier agreement, of August 3, 1956, between Briggs and the Briggs Filtration Company (hereinafter called BFC). Defendants contend that under this agreement BFC has the exclusive right to sue for infringement of the '807 patent. Plaintiffs admit that if BFC has such right, then Stone could not receive any rights with respect to that patent under the 1957 contract, nor would Briggs have a right to sue for its infringement. Plaintiffs deny, however, that the 1956 agreement applies to '807.

Paragraph 8 of the 1956 contract provides, in pertinent part, as follows:

"If, during the existence of this agreement, there is any infringement by others of any patent or patentable improvements herein licensed to Company, Company shall have the sole right, *in case such patent or patentable improvement is licensed to it under paragraph 2 hereof,* to institute or bring and to prosecute any suit or proceedings of any kind, either in the name of Company, in the name of Briggs, or in their joint names, for the purpose of enjoining such infringement and recovering damages."

(Emphasis added.) Paragraph 2 of this agreement provides in pertinent part, as follows:

"Briggs hereby grants to Company an exclusive license to make, use and sell and sublicense others to make, use, and sell * * * products or devices embodying all inventions covered by a claim in Letters Patent numbers 2,746,608; 2,669,318; 2,468,862; 2,454,033; 2,420,414; 2,407,247; 2,390,494; 2,374,976; 2,249,681 and patent applications Serial No. 43,797; Serial No. 486,850, and any and all patents which may issue thereon, together with all patentable improvements or modifications thereon which may be acquired, owned or controlled by Briggs. The license hereby granted shall extend throughout the life for which Letters Patent for said inventions and improvements may have been or may be granted to Briggs and shall include all reissues, divisions, continuations, patentable improvements or modifications which cover directly or indirectly the subject matter hereof."

Defendants maintain that the '807 patent, issued on January 5, 1960, is a "patentable improvement or modification" of certain of the patents listed in paragraph 2, particularly since the paragraph specifies "patentable improvements or modifications which cover directly or indirectly the subject matter hereof." Since certain of the patents listed in paragraph 2 concern filters containing a pleated filter element, defendants argue, the '807 patent, which likewise concerns a filter with a pleated filter element, is an improvement or modification thereon.

Plaintiffs contend that the '807 patent is not an improvement or modification of any patent listed in paragraph 2. I agree. When paragraph 2 is viewed in the context of the entire agreement, and when the nature of the patents listed in paragraph 2 is compared with the nature of '449, '807, and other patents covered by the contract, the conclusion is compelled that '807 is not comprised

within the improvements and modifications clauses of paragraph 2. These clauses, by their nature, must be strictly construed. Gas Tool Patents Corp. v. Mould, 133 F.2d 815 (7th Cir. 1943).

A brief statement of the circumstances leading up to this contract is found therein. The contract recites that by a previous contract and two supplemental agreements, "said agreement as so supplemented being sometimes herein called 'Agreement'," Briggs had granted to BFC exclusive license to all his inventions pertaining to the field of oil filtration. The contract further recites that disputes had arisen between the parties concerning royalties. By paragraph 18 of the contract, the "Agreement" previously in force is terminated and cancelled.

In paragraph 1, the contract provides that "Company hereby releases Briggs from any obligations in Agreement to grant to Company any rights under any future inventions of Briggs pertaining to the field of oil filtration." Having thus cancelled the effect of the earlier contracts, the contract then proceeds to specify in detail what particular licenses BFC it to possess.

In paragraph 2, set forth above, Briggs grants to BFC *exclusive* license to certain specified patents and improvements and modifications thereon.

In paragraph 3, Briggs grants to BFC *nonexclusive* license to certain specified patents and improvements and modifications thereon.

Paragraphs 4 and 5 define the rights of the parties regarding other specified patents.

Paragraph 6 provides that BFC releases its exclusive license on the '449 patent, and Briggs grants to BFC a nonexclusive royalty free license with respect to that patent. This paragraph contains nothing about improvements or modifications of the '449 patent.

In these paragraphs, the contract clearly purports to delineate the respective rights of the parties concerning all of the patents and inventions of Briggs to which BFC has any right or claim.

Paragraph 2 must be read in this context of the contract. Returning to the language of that paragraph, we must first inquire, is '807 an improvement or modification of any of the patents listed therein (or the patent applications listed therein, which subsequently issued as patents Nos. 2,768,754 and 2,850,169)? The evidence establishes that only two of these patents, 2,468,862 and 2,420,414, relate to filters with radially pleated filter elements. The remaining patents use other types of filter elements or do not concern the type of filter material employed.

Is '807, then, an improvement or modification of 2,468,862 or 2,420,414, within the meaning of those terms as used in the contract?

Patent '862 concerns the construction details and disposition of certain portions of a pair of end plates of a filter, using a pleated element which is composed of a layer of ribbed cellulose wadding and a layer of filter paper. Patent '414 concerns the construction details and disposition of certain clamping members for detachably securing a radially pleated or folded filter element to a foraminous tubular core.

Neither of these is a basic patent for a filter employing a radially pleated filter element with grooves running radially from the core. Rather, they concern particular features of a filter employing a radially pleated filter element, and their subject matter, dealing with such specific features, is different from the subject matter of '807, which concerns the bonding of a cover member to the outside edges of the radial pleats when the pleat walls are of unequal depth. As '862 and '414, then, are not basic patents, it is reasonable to conclude that the parties to the 1956 contract had in mind the particular functions of these patents, rather than the broad field of any kind of filter using a radially pleated filter element, when they spoke of improvements and modifications on these patents. Cf., Gas Tool Patents Corp. v. Mould, 133 F.2d 815 (7th Cir. 1943).

Moreover, at least one of the mechanical elements of each claim of '862 and

'414 is absent from the '807 structure. This fact, too, indicates that '807 is not an improvement or modification of these earlier patents. Ibid.

When the provisions of other paragraphs of the contract are considered, the indications become even stronger that the improvements and modifications provisions of paragraph 2 do not comprise the '807 patent. Paragraph 6, dealing with '449, grants no rights to BFC with respect to improvements or modifications thereon. Paragraph 3, which grants to BFC a nonexclusive license, lists one patent covering a filter with a radially pleated filter element, which patent is just as closely related to '807 as are '862 and '414. The paragraph 3 patent, 2,401,222, concerns a radially pleated filter element employing absorbent material in conjunction with filtering material. As is the case with the paragraph 2 patents, the '807 structure does not employ all of the mechanical elements of any of the claims of the '222 patent.

Thus, it would be illogical to say that because two patents using a radially pleated filter element are found in paragraph 2, '807 is an improvement or modification thereof because it, too, uses such an element. If this line of reasoning were followed, as plaintiffs have pointed out in their brief, '807 would be an improvement or modification of patents in both paragraph 2 and paragraph 3, and BFC would have both an exclusive and a nonexclusive license to '807.

Defendants rely heavily upon certain testimony of plaintiffs' expert witness elicited on cross-examination, as follows:

"Q. Mr. Fishleigh, do you agree it would be possible to make the pleated filter paper of patent 2,468,862 utilizing the method of the '807 patent?

"A. I think that might be possible".

The relevance of this testimony is not apparent. That it might be possible to make the pleated filter *paper* of '862 utilizing the method of '807 (i. e., using a Chandler pleater) does not indicate that '807 is an improvement or modification of '862. Even if the testimony indicated that it would be possible to construct the *filter* described in '862 using the bonding method of '807 on the cover member, my conclusion would be the same. '862 is not a basic patent as regards '807, and '807 does not concern or modify or improve upon the specific subject matter of '862 or employ all the elements of any claim thereof.

The evidence discussed above establishes that BFC does not have an exclusive right to sue for infringement of '807. It is worthy of mention that other circumstances, too, are consistent with and lend support to this conclusion. Specifically, neither BFC nor any successor thereto has ever claimed any rights regarding '807. Moreover, the 1956 contract between Briggs and BFC marked a "parting of the ways" under an agreement which did not prevent Briggs from competing with BFC and did not oust him for any period of time from the oil filtration field.

█ Briggs, as owner of patents '449 and '807, has the right to sue for infringement thereof. Stone, under its 1957 license agreement with Briggs, also has the right to sue for infringement of these patents.

RELEVANT HISTORY OF PAPER FILTERS FOR DIESEL LOCOMOTIVE AND OF BRIGGS' ACTIVITIES IN THE OIL FILTRATION FIELD

Before the major issues of validity and infringement are considered, it will be useful to set forth certain relevant history regarding oil filtration in diesel locomotives and Briggs' background in this field.

During the decade of the 1940's, the steam locomotive was being replaced by the diesel locomotive in the United States. Evidence regarding the Seaboard Airline Railroad, for example, shows that by April, 1947, a portion of its fleet of locomotives had been converted to diesels, and that by 1954, the entire Seaboard fleet were diesels. The proper lubrication and oil filtration of a diesel loco-

motive comprises the single most important item of maintenance of such locomotives. Improper lubrication and oil filtration can result in engine parts failures, or complete engine failures, which can be very costly, and the nature of the oil and filters used affect the frequency of the need to change oil and filters.

Briggs made a survey in 1957 in which he found that there were approximately 30,000 diesel locomotives in operation in the United States. Each diesel locomotive used an average of four or five filters; consequently, if the filters could be used for a thirty day period, there was a market for approximately 125,000 diesel locomotive lubricating filters per month.

In 1957, the filters used by the American railroads were almost exclusively cotton waste filters. At that time, M & J and Superior were major manufacturers of cotton waste filters.

The cotton waste filter, a depth type filter, was unsatisfactory in diesel locomotives in several ways. First, filter changes were required about every fifteen days. Second, the cotton waste filter is not a full flow filter and cannot pass the full flow of oil even when new. Third, maximum engine wear occurs from abrasive particles in the oil stream ranging in size up to twenty microns. Small particles, below five microns, have much less tendency to produce wear than do larger particles. A Seaboard study showed that the cotton waste filters remove the smaller particles, but permit larger wear producing particles to pass into the engine, with the result that the bulk of the wear producing particles remain in the lubricating oil. Fourth, each time a cotton waste filter is removed from the diesel locomotive, it retains approximately two gallons of oil which is lost when the filter is discarded. On the Seaboard Airline Railroad eighty per cent of the total oil consumption on the railroad is make-up oil to replace that lost when the filters are changed and discarded.

These shortcomings of the cotton waste filter led to attempts to develop a more satisfactory filter. The National Filter Corporation, with M. A. Simpson as its president and general manager, attempted from 1956 to 1960 to develop a pleated paper filter for diesel locomotives. When National went out of business in 1960, the National filter would have still required more money for development.

Briggs Clarifier Company, prior to 1957, sold a paper disk pack refill to one or two railroads.

Another company, Hi Ball, developed a filter using chopped paper, but tests made by Seaboard Airline Railroad showed it to be unsatisfactory.

Prior to 1957, a company by the name of Winslow, located in Oakland, California, attempted to make a paper filter, but its filter could not be made small enough to satisfy the railroads.

Also prior to 1957, a company by the name of Marrow, located outside of Baltimore, Maryland, attempted to market a filter made of blocks containing paper. But only a few such filters were sold, the railroads showing little interest in the filter.

Briggs began working in the field of oil filtration, and specifically with oil filters, in 1928. His principal efforts since then have been directed to that same field. Briggs has been granted in excess of thirty patents in the field of oil filtration.

In 1956 Briggs was interested in entering the field of pleated paper filters for diesel locomotives, and he convinced Mr. Platt, president of Stone Straw Corporation, that the Stone organization should go into this business. Briggs and Stone began a program to develop a satisfactory lubricating oil filter for diesel locomotives and to convince the railroads of its superiority over the cotton waste filter.

Briggs had obtained the '449 patent while he was with the Briggs Clarifier Company. After entering into the agreement of January 4, 1957, with the Stone organization, Briggs went to the Blandy Paper Company, acquired some filter pa-

per, and then went to Ayer, Massachusetts, to the Chandler Company, to have the paper pleated on a Chandler pleater. Briggs took this paper back to Washington, D. C., and, in late February or early March, 1957, built experimental pleated paper filters for diesel locomotives.

Briggs had known Mr. Vincent Long, director of research of the Blandy Paper Company, for more than twenty years. Mr. Long made a satisfactory paper for use in diesel locomotives under Briggs' specifications and developed by Briggs. Prior to 1961, plaintiffs bought all of their corrugated paper for their filters from Blandy. Although corrugated filter paper had previously been on the market, no such paper suitable for use in diesels had been on the market. In 1960, Blandy was selling plaintiffs a corrugated paper having a 90 pound basis weight with a five-second A.C. flow rate. Plaintiffs are still using paper developed by plaintiffs and made by Blandy in 1957.

In the spring of 1957, plaintiffs bought a Chandler pleater to pleat the paper for their filters. Chandler pleaters produce uneven pleats or pleats of unequal depth, and all the filters sold by Stone have used pleats with walls of unequal depth. Filters of diesel locomotives are of the order of thirty inches in length, and the paper filter element is soft and stretchable; consequently, the pleats will collapse under the pressure of oil unless the outsides of the pleats are securely held in position. A force of only four or five grams will cause such pleat collapse in plaintiffs' filters. Briggs found that the usual methods of adhesively securing the outsides of the pleats to the cover would not work using the paper pleated on the Chandler pleater, because the shorter of the pleats did not touch the cover member. To overcome this problem, he devised a method of simultaneously shrinking and bonding the cover member about the pleats, thereby placing the pleat walls under stress and bowing the longer walls to achieve contact between the cover and the shorter walls. The '807 patent was granted to Briggs covering the bonding of pleats having walls of unequal depth to the cover member and his method of achieving this result.

The pleated paper filters which Briggs produced removed the abrasive particles successfully, but the first Stone filters did not produce visually clean oil because they did not remove some of the smaller particles, of one micron or less, and the railroads generally prefer visually clean oil, considering it indicative of proper oil filtration. After certain changes were made in the Stone filters to overcome this difficulty, Briggs supplied approximately one hundred of his filters for extensive road and bench tests by the Baltimore & Ohio Railroad, comparing them with the cotton waste filters.

The road tests on the Baltimore & Ohio Railroad were made on regular passenger locomotives in scheduled operation. Each of these locomotives had two diesel engines. Cotton waste filters were used in in one engine, and Briggs' filters in the other. These tests showed that the pleated paper filter removed the abrasive material from the lubricating oil a good deal better than the cotton waste filter. They also showed that the paper filter absorbed about one-half gallon of oil, while the cotton waste filter absorbed about two gallons of oil, which oil was lost when the filter was discarded.

Similar tests on the Seaboard Airline Railroad, reported in March, 1961, produced almost identical results with those obtained by the Baltimore & Ohio.

In 1957, Stone sold no filters at all. For the fiscal year 1958, 100 were sold, at a price of $352.80; for 1959, 16,000 were sold, at a price of $57,517; for 1960, 75,000 were sold, at a price of $265,047; for 1961, 120,000 were sold, at a price of $443,000; for 1962, 225,000 were sold, at a price of $868,000; and for 1963, up to September 30, 280,000 were sold, at a price of slightly more than a million dollars.

Plaintiffs were the first to build canless filters for diesel locomotives, and such filters, with metal and caps, were built and sold by plaintiffs at least by 1959.

## VALIDITY OF THE PATENTS
### *Presumption of Validity*

The patent laws provide, in 35 U.S.C. § 282, that

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

Defendants maintain that in the circumstances of this case, the statutory presumption is destroyed or at least greatly weakened as to both patents in issue.

The first question to be resolved regarding validity, then, is: to what extent, if any, does the statutory presumption of validity apply to patents '449 and '807?

### The '449 Patent

Defendants assert that Greene patent No. 1,639,133, which concerns a pleater paper filter, was not considered by the Examiner who issued the '449 patent. Therefore, defendants contend, the statutory presumption is inapplicable because

"Even one prior art reference, which has not been considered by the Patent Office, may overthrow the presumption of validity." Dresser Industries, Inc. v. Smith-Blair, Inc., 322 F.2d 878, (9th Cir. 1963).

■ It is well settled that where the Patent Office has not considered pertinent prior art, the statutory presumption of validity is seriously weakened or completely destroyed. See, e. g., Murray Co. of Texas, Inc. v. Continental Gin Co., 264 F.2d 65 (5th Cir. 1959); Cornell v. Adams Engineering Co., 258 F.2d 874 (5th Cir. 1958); Fritz W. Glitsch & Sons, Inc. v. Wyatt Metal & Boiler Works, 224 F.2d 331 (5th Cir. 1955). On the other hand, failure of the Patent Office to cite a patent does not necessarily rebut the presumption.

"It has been held, and we think with logic, that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently over-

looked." Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 4 (7th Cir. 1953).

■ Examination of the cases cited above reveals that where a patent not cited by the Patent Office and not otherwise shown to have been considered thereby is highly pertinent, or the most pertinent, prior art, the statutory presumption is considered weakened or destroyed. Where the patent is not as relevant as the patents considered by the Patent Office, however, the statutory presumption is not affected. In Adams v. Columbus Mfg. Co., 180 F.Supp. 921, 930 (M.D.Ga.1960), the court stated:

"Furthermore, references not of record in the patent office cannot weaken the statutory presumption if they do not involve some substantial element in the defense of anticipation which was not considered by the patent office. Otto v. Koppers Company, 4 Cir., 1957, 246 F.2d 789, 801."

■ Is the Greene patent, then, such pertinent prior art that failure of the Patent Office to cite it renders the presumption weak or non-existent? I find that it is not.

Mr. Lauer, defendants' expert witness, testified that the Greene patent "as set up" could not be used to filter lubricating oil in an internal combustion machine. The patent itself discloses that the filter involved is an air filter. Mr. Lauer noted that the Greene filter element was "screen cloth." It is not paper, as defendants state in their brief, but as described in the patent, "wire screening" or "woven wire screen." Moreover, it is not pleated, in the sense of the '449 patent, where the edges of the pleats are alternately adjacent the inner core and the outer periphery of the filter, but rather it is corrugated or provided with "projections" and then is rolled into several layers, the corrugations or projections of the element serving to space apart the layers of material and to direct the flow of air through the layers in sequence. Mr. Lauer testified that the three best prior art references were Briggs patents Nos.

2,092,548 and 2,321,985 and Vokes British patent No. 401,287. All of these were cited as references by the Patent Office, and are far more pertinent than the Greene patent.

The conclusion is compelled that failure of the Patent Office to cite the Greene patent has no effect upon the presumption that the '449 patent is valid. The three most pertinent references, by Mr. Lauer's own testimony, were considered by the Patent Office, which conducted a thorough examination of the patent application. Under these circumstances, the statutory presumption is strengthened, not weakened. See Anderson Co. v. Sears, Roebuck & Co., 265 F.2d 755, 761 (7th Cir. 1959); Lewyt Corp. v. Health-Mor, Inc., 181 F.2d 855, 857 (7th Cir. 1950).

### The '807 Patent

Defendants contend that Raymond W. Colton, the attorney who prosecuted the '807 patent before the Patent Office, found, in his own prior art search, three patents concerning pleated paper filters which he did not include in the specifications of the '807 patent.[1] These are: Bell patent No. 2,642,187; Layte No. 2,663,660; and Parker No. 2,739,916. Defendants state further that although Mr. Colton included two patents, Hough No. 2,785,805 and Fricks et al. No. 2,749,265, in the specifications, he did not call to the Examiner's attention the "pertinence" of these patents. Defendants note that the only reference cited by the Examiner is Fricke patent No. 2,748,948.

Defendants rely upon Tipper Tie, Inc. v. Hercules Fasteners, Inc., 130 F.Supp. 3 (D.N.J.1955), affirmed, 232 F.2d 635 (3d Cir. 1956), as involving "less flagrant" circumstances than those here involved, and holding that the patent applicants' neglect to call a certain patent to the attention of the Patent Office rendered the presumption of validity weak.

The Tipper Tie case is readily distinguishable from the circumstances here presented. There, the applicants knew of the most significant reference, but called it to the attention of the Patent Office only after the patent had issued and only by an amendment adding a claim in which the name of the patentee but not the patent number of this reference was listed. In marked contrast, in the case at bar the evidence shows that Mr. Colton included in the patent specification the two patents which he regarded as the most pertinent prior art references.

Defendants make the somewhat curious assertion that Mr. Colton did not call the attention of the Patent Office to the "pertinence" of the two references which he cited in the specification. Obviously he cited them because he regarded them as pertinent, and it would certainly be apparent to the Patent Office that he cited them for that reason. The Examiner himself did not cite these particular patents; but under the circumstances, it is far more logical to assume that he did not cite them because he regarded them as less significant than the patent he cited, than to assume that he neglected to consider them.

Mr. Colton's failure to cite the Bell, Layte, and Parker patents, which he found but did not include in the specification, and the Examiner's failure to cite these patents, does not affect the presumption of validity. Defendants assert that these patents "concern pleated paper filters and are therefore on their face, pertinent art." Defendants, however, do not show, either by argument or by citation to any evidence of record, *how* these patents are pertinent. They are far less relevant than the patent cited by the Examiner and those included by Mr. Colton in the specification.

The Bell, Layte, and Parker patents all relate to filters with pleated filter elements that are bonded or cemented to the end discs or end plates, rather than to the outer cover or wrapper, as is the case with '807. Mr. Lauer did not testify with respect to the Parker and

---

1. It was defendants' original contention that this conduct constituted a fraud on the Patent Office; defendants have not pursued this contention, however, since the trial.

Layte patents, which were admitted into evidence for a limited purpose. But he did testify that the three most pertinent patents in defendants' exhibit 2, which included the Bell patent, were Fricke 2,748,948; Fricke 2,749,265; and Foust 2,914,179, in that order. The three latter patents concern pleated filter elements with outside edges of the pleats secured to the cover wrapper or member. It seems obvious that Bell, Layte, and Parker are not so pertinent that failure of Mr. Colton to specify them and failure of the Examiner to cite them affects the presumption of validity. The most pertinent prior art was considered by the Patent Office, which thoroughly examined the application for this patent.

### "Obviousness" of the Inventions
### The '449 Patent

Having determined that the statutory presumption of validity attaches to the '449 patent, we now turn to the question whether defendants have sustained their burden of establishing its invalidity. The presumption "can be overcome only by clear and convincing proof * * *, and reasonable doubts must be resolved in favor of validity." Moon v. Cabot Shops, Inc., 270 F.2d 539, 541 (9th Cir. 1959).

Defendants contend that the '449 patent is invalid for "obviousness." The patent statute provides as follows:

> "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

Defendants assert that claims 9, 10, 11, and 12 of the '449 patent are invalid because they "define nothing more than taking the prior art wadding filter material of Briggs '548 (No. 2,092,548) and folding it to make radial pleats as in

Greene (1,639,133), Poelman et al. (2,-122,111) or Vokes (British patent 401,-287)." (Def. Br. 15.) "This," defendants assert, "would have been obvious to a person having ordinary skill in the art."

It should first be noted that there is no testimony in the record, by defendants' expert or otherwise, indicating that the '449 structure would have been obvious to one with ordinary skill in the art. Several facts, established in the record, indicate to the contrary.

It should also be noted that the only references which were noticed by defendants under 35 U.S.C. § 282 as prior art against the '449 patent were the following:

| | |
|---|---|
| 1,639,133 | Greene |
| 2,092,548 | Briggs |
| 2,122,111 | Poelman et al. |
| 327,234 | Vokes (British) |
| 401,287 | Vokes (British) |

These patents, I have ruled, are the only ones that defendants may rely upon to show the state of the prior art at the time of the application for Briggs '449.

The '449 patent concerns a filter with a pleated filter element having ribs extending radially of the pleats to provide passage for the flow of oil. More specifically, claims 9, 10, 11, and 12 disclose a filter element in the form of a tubular body comprising a web of filter material folded to extend back and forth between the inner and outer peripheral surfaces of the tubular body, with the folds of the web at the inner surface of the tubular body being juxtaposed and in contact with each other. The web of filter material is variously described in these claims as ribbed cellulosic filter material with the ribs extending in a general radial direction with respect to the tubular body; or with well defined grooves formed in the web, which grooves extend lengthwise of the web or in a general radial direction with respect to the tubular body, to provide passages between the contacting surfaces and thereby permit the free flow of a fluid between

such surfaces; or ribbed cellulosic wadding, the ribs extending lengthwise of the web and radially of the tubular body to form passages for a fluid between the inner contacting folds.

Significant in these claims is that the inner edges of the pleats are juxtaposed and in contact with each other, and that to permit the flow of liquid between the contacting surfaces, grooves are provided in the filter material running radially of the tubular body.

Because the inner pleats are juxtaposed, a large number of pleats can be achieved, and consequently a greater filtering surface than if the inner edges of the pleats had to be spaced apart. The grooves or ribs serve to allow fluid to flow, even though the inner surfaces of the pleats are in contact. The result of these factors is a workable oil filter. None of the prior patents cited by defendants incorporated juxtaposed inner surfaces of the pleats with grooves extending radially to permit the flow of fluid through the filter material.

Filters with radial pleats are found in the prior art, as defendants assert. But defendants have not cited any prior art involving a pleated filter for fluid with either inner pleat edges juxtaposed or with grooves or corrugations running radially of the tubular body.

Defendants, in their brief, point to Greene patent No. 1,639,133; Poelman et al. patent No. 2,122,111; and Vokes Br. 401,287 as showing that radially pleated filters are "old." None employs radial grooves or ribs, as mentioned. With the possible exception of Poelman, which is not a fluid filter, none employs radial pleats in contact with each other at any point.

The Greene patent is an air filter. While in a sense it employs "pleats," they bear little resemblance in either appearance or function to those of '449. (The Greene filter is described in more detail, supra, in the section of this memorandum concerning the presumption of validity of the '449 patent.) Defendants' expert conceded that it would be unsuitable for oil filtration.

The Poelman et al. '111 patent concerns a gas mask. The drawings of this patent show radial pleats with the inner edges of the pleats in contact. But, again, defendants' expert conceded that this filter would be unsuitable for oil filtration.

The Vokes '287 patent discloses a filter using a screen formed of felt or fabric stitched to a rather light wire gauze or lying between two layers of such gauze. The screen is bent into a pleated cylindrical or star shape. The patent fails to disclose filter material having ribs or grooves therein. Moreover, the patent does not disclose or claim pleats the inner edges of which are juxtaposed, and the drawing shows inner edges of the pleats spaced apart and *not* juxtaposed. Defendants' expert conceded that the filter shown in this patent might not be suitable as an oil filter and that he would not make an oil filter that way.

The Vokes '234 patent (not discussed in defendants' brief, though noticed under the statute to plaintiffs as a prior art reference) shows an oil filter with radial pleats, but there are no radial ribs or grooves. The patent contains no disclosure or claim regarding contact of the pleats at the inner edges, and the drawing shows pleats spaced apart at the inner edges.

The only patent referred to as prior art by defendants which employs filter material with ribs or grooves is Briggs No. 2,092,548. In this patent, corrugated wadding is used as a filter material. Unlike '449, however, the wadding is wound around the central core of the filter, to form a plurality of layers. The ribs extend lengthwise of the filter, rather than radially thereof. And the oil generally flows through the material and not lengthwise of the channels as in the '449 structure. The grooves in '548 are not provided for the purpose of channeling the flow of oil, but to prevent the wadding from softening when exposed to water by giving the wadding greater "body" or strength. (P. 1, col. 2 of the patent.) Moreover, the '548 filter is a depth type filter with some surface

filtering, whereas the '449 filter is solely a surface type filter.

I do not think that from the prior art relied upon by defendant, the '449 structure would have been obvious to a person skilled in the filter art. Ribbed or corrugated filter material was not used in any of the references relied upon by defendants to permit the flow of oil between stretches of material lying in contact with each other.

██ I find that the '449 patent discloses something novel, i. e., a filter with pleats lying close together at the inner folds, with grooves achieved by using ribbed material in such a way that the high points of the ribs on one stretch meet the high points of the ribs on adjoining stretches, the grooves thus formed permitting the fluid to flow between the stretches rather than being stopped or slowed down by the filter material where the stretches are in contact.

The result of this invention is an advance in the art, a significant improvement over prior mechanism. See Curtiss-Wright Corp. v. Link Aviation, Inc., 182 F.Supp. 106, 114 (N.D.N.Y.1959). As has already been stated, the cotton waste filter, used exclusively to filter the lubricating oil in diesel locomotives prior to 1957, was unsatisfactory in several ways, including the fact that it is not a full flow filter and cannot pass the full flow of oil even when new, and the fact that it retains a great deal of oil that is lost when the filter is discarded. A paper filter was thought to be possible which would overcome these and other difficulties. But to be efficient, the paper filter would have to have a considerable amount of filter surface. The '449 structure provides this by using radial pleats lying in contact at the inner edges. But without the grooves or ribs of the '449 patent, the evidence shows, such a radially pleated paper filter is not workable, because it allows less flow of oil through the filter. Defendants tried a radially pleated filter that did not have such grooves, and it proved unsatisfactory.

Further indication that the '449 patent claims represent a significant advance in the art is provided by defendants' imitation thereof. Kurtz v. Belle Hat Lining Co., 280 F. 277, 281 (2d Cir. 1922). Until defendants began to employ radial pleats juxtaposed at the inner edges *along with* ribs or grooves running radially of the tubular body, they met with little success.

The claims in issue of the '449 patent have not been shown by the defendants to be invalid as "obvious" at the time of the invention. To the contrary, the evidence shows that the claims in issue of the '449 patent represent invention.

*Double Patenting.* Defendants contend that claims 9, 10, 11, and 12 of the '449 patent are invalid for double patenting. They assert that the claims of '449 show no invention beyond the claims of Briggs patent No. 2,321,985, the application for which was copending with that for '449.

The '985 Briggs patent concerns a filter element of ribbed cellulose wadding, rolled to form multiple layers, with the resulting channels formed between the layers running lengthwise of the element. The fluid flows downward through the channels, and the solids in the fluid are separated out by being deposited upon fibers of the wadding.

██ Copending applications of the same inventor are not prior art as to each other; but under the doctrine of double patenting, "the claim of the later patent [here '449] must show an invention beyond the claim of the first." Weatherhead Co. v. Drillmaster Supply Co., 227 F.2d 98, 102 (7th Cir. 1955).

In In re Copeman, 135 F.2d 349, 352, 30 C.C.P.A., Patents, 962 (1943), relied upon in the Weatherhead opinion, supra, the Court of Customs and Patents Appeals stated:

> "It is not a question here as to whether, standing alone, appellant's process of coloring the rubber is inventive, but the important question is whether it is inventive over the

claimed process of appellant's reissue patent * * *."

To the same effect, see Application of Bigelow, 194 F.2d 550, 552, 39 C.C.P.A., Patents, 835 (1952).

In applying the test of invention in this context, it is instructive to bear in mind the purpose of the double patenting rule. In Weatherhead, the Court, after stating the previously quoted rule that the claims of the later patent must involve invention over the claims of the first patent, further stated as follows:

> "The test for double patenting adopted by the Court of Customs and Patent Appeals seems to us to be the correct one. The principal reason for prohibiting double patenting, is to prevent inventors from getting more than the seventeen year monopoly on one invention. An extension of monopoly is only justified by the presence of invention which grants the second application as much dignity as the first. In the instant case, for example, the appellants have absolutely nothing to gain by patent 217 except an extension of their monopoly by almost one year. No one could manufacture the device claimed in 217 without infringing 413. Application of Coleman, 38 C.C.P.A., Patents, 1156, 189 F.2d 976, 979. The later patent is not at all necessary to protect the packing ring described therein * * *."

In Coleman, 189 F.2d at 979, 38 CCPA 1156, cited in the above quotation, the Court of Customs and Patents Appeals stated:

> "A further factor to be accorded probative value in the determination of distinctness is whether the claims of the patent may be practiced without infringing the subsequent application claim, if allowed, and whether the subsequent claim may be practiced without infringing the claims of the patent."

With these guides in mind, we must ask whether the claims of the '449 patent show invention over the claims of '985 and whether by the grant of the '449 patent Briggs achieved, in effect, an extension of the monopoly obtained by the grant of the '985 patent without showing any inventive advance thereover.

I find that the claims in issue of the '449 patent show invention over the claims of '985. Defendants argue that the use of grooves formed by ribs in the filter material and used to channel the flow of fluid cannot be the "invention" of '449, because it was the "invention" of '985. But this argument isolates the only common features of the two patents. Defendants' expert, Mr. Lauer, conceded that "the only similarity between the '449 patent and the Briggs Patent No. 2,321,985 is that each of them employ in quite different ways filter material that is ribbed." (Tr. 1449) He also admitted that none of the claims of the '985 patent covers the '449 structure and that none of the claims of '449 covers the '985 structure.

These two filters operate in very different ways, aside from the obvious difference that one has a rolled filter material and the other a pleated one. In '985, the flow of liquid is from the top downward; in '449 it is from the outside inward. In '985, the liquid flows lengthwise through the channels, and does not pass through the paper; in '449, the liquid flows both lengthwise through the channels and through the paper as well.

I find that the '449 patent involves invention over the '985 patent claims. The '449 patent does not involve an improper extension of the monopoly granted to Briggs by the '985 patent. The claims of the '985 patent can be practiced without infringing the '449 claims, and the claims of the '449 patent can be practiced without infringing the '985 claims.

It should be noted that the Patent Office was aware that the applications of '985 and '449 were copending. We may assume that the Patent Office considered there was no double patenting when it issued the '449 patent.

*The '807 Patent*

Inasmuch as the statutory presumption of validity applies to the '807 patent, the question presented is whether defendants have sustained their burden of establishing its invalidity "by clear and convincing proof * * * [with] reasonable doubts * * * resolved in favor of validity." Moon v. Cabot Shops, Inc., 270 F.2d 539, 541 (9th Cir. 1959).

The claims in question are claims 4, 6, 8, 9, 10, and 11 of the '807 patent. They read as follows:

"4. A filter comprising a permeable impregnated paper filter element having axial pleats with walls of unequal depths defining a plurality of inner and outer peaks, said outer peaks being spaced apart and lying substantially in a cylinder, a substantially uniformly permeable core disposed within said element for engagement with said inner peaks, an annular cover member permeable substantially throughout its length embracing said outer peaks throughout their length, and an adhesive bonding said cover member to outer peaks."

"6. A filter as set forth in claim 4 wherein said adhesive is thermosetting."

"8. A filter as set forth in claim 4 wherein said walls are under stress."

"9. A filter as set forth in claim 4 wherein said peaks engage said core and certain of said walls are bowed."

"10. A method of maintaining adjacent pleats of an annular filter element in spaced relationship comprising circumscribing said element with a cover member and simultaneously shrinking said cover member about and bonding it to peripheral protions of said pleats."

"11. A method as set forth in claim 10 wherein said shrinking and bonding are effected as a superatmospheric temperature."

This patent is not a basic patent with regard to the type of filter disclosed. That is, the patent itself acknowledges that the basic arrangement of an annular pleated filter element, circumscribed by a cover member and containing a core, with impregnated paper used as the filter element, is found in the prior art. The invention, if any, of this patent, concerns the securing of the outer peaks of the pleats to the cover member, by bonding, where the walls of the pleats are of unequal length, and the inner peaks of the pleats engage the inner core. The patent was intended to solve a particular problem encountered in a filter having the basic arrangement described. It was considered desirable to bond the outer edges of the pleats to the cover member in order to hold the pleats in spaced relationship and thereby to overcome the tendency of adjacent pleats to stick together as an effect of adherent cake formations and the resulting increase of differential pressures. But prior methods of bonding the outer pleat edges to the cover member would not work with filter material pleated on a commercial paper pleating machine, because such a machine produced pleats of unequal length. The aim of the patent, then, was to present a method whereby pleats of unequal length could be bonded to the cover member.

The only patents or other publications which were noticed by defendants under 35 U.S.C. § 282 as prior art against the '807 patent were the following:

| | |
|---|---|
| 2,122,111 | Poelman et al. |
| 2,642,187 | Bell |
| 2,683,536 | Kasten |
| 2,689,652 | Gretzinger |
| 2,749,265 | Fricke et al. |
| 2,914,179 | Foust. |

In addition, defendants asserted use and sale of a filter by National Filter Corporation from 1956 to 1960.

The patents listed above, I have ruled, are the only ones that defendants may rely upon to show the state of the prior art at the time of the application for Briggs '807.

Defendants make three principal contentions: (1) that prior patents disclosed filters with the basic arrangements described above and with the outer edges of the pleats bonded or otherwise secured to the cover member; (2) that prior patents disclosed filters with this basic arrangement and with bowed or stressed walls; and (3) that a prior patent disclosed (in the words of the defendants) "the method of maintaining adjacent pleats in spaced relationship by circumscribing a pleated filter element with a cover member or protector strip and shrinking or contracting the cover member about the peripheral portions of the pleats." (Def. Br. 21–22) Claims 4, 6, 8, and 9 of '807 would have been obvious to one with ordinary skill in the art, defendants assert, because of points (1) and (2) above. Claims 10 and 11, the method claims, would have been obvious, defendants assert, because of point (3) above.

To appraise this argument, we must view in combination the several features of the prior art relied upon by defendants. Before this view can be taken, however, the several patents and their respective features must be reviewed singly.

### (1) Prior Art Patents Disclosing Bonding of the Outer Edges of the Pleats to the Cover Member

Defendants correctly assert that both Fricke et al. patent No. 2,749,265 and Foust patent No. 2,914,179 show a permeable impregnated paper filter element having axial pleats with walls defining a plurality of inner and outer peaks, said outer peaks being spaced apart and lying in a cylinder, a substantially uniformly permeable core disposed within said element for engagement with said inner peaks, an annular cover member permeable substantially throughout its length embracing said outer peaks throughout their length, and an adhesive or cement bonding (in the case of Foust '179, staples or an adhesive securing) said cover member to said outer peaks.

Defendants also note that the filter produced by the National Filter Corporation under the Foust patent from 1956 to 1960 used an adhesive bonding the cover wrap to the outside edges of the pleats.

Plaintiffs note that certain significant differences exist between the Fricke '265 patent, the Foust patent, and the National filter, on the one hand, and the '807 claims on the other hand.

As to Fricke '265, the claims thereof specifically define the pleats as being uniform; consequently, it is clear that this patent does not deal with the pleat collapse problem presented when the pleats are unequal. Moreover, the filter shown in Fricke '265 is small and is intended for use in automobiles; consequently, the pleat collapse problem would not be as serious as it is with regard to a filter of the '807 type. The patent does not teach that the pleats should be bowed or stressed in order to achieve the bonding necessary to solve the pleat collapse problem where pleats are not uniform; nor does it disclose the use of thermosetting adhesive to bond the outer cover to the outer peaks of the pleats.

As to Foust '179, the patent drawings show pleats of uniform depth. Nothing in the patent concerns pleats of unequal depth, or walls that are bowed or stressed. Thus, it does not deal with the pleat collapse problem where the pleats are not of uniform depth and it does not teach a solution to this problem. The only "collapse" problem discussed in '179 is that which results when the pleats cave in toward the core or center tube. The patent teaches that "stiffening fingers" should be used to reinforce the pleats to prevent this "caving in" from occurring. The Foust patent does not teach the use of resin impregnated paper as the filter element, and it does not teach the use of a thermosetting adhesive to bond the cover to the pleats.

As to the National filter, it was unsatisfactory in operation, and National went out of business in 1960, after efforts at

improvement of substantially all of the filter components. The filter paper used in the National filter was very heavy with a basis weight of over 300 pounds, and for this reason a force in excess of three pounds (as compared with a few grams as to the Stone filter) is required to move adjacent pleats together when the pleats are not bonded to the cover member. The National lubricating oil filter was made in two sections, further reducing the likelihood of pleat collapse. The problem of pleat collapse is most acute when light, resin impregnated paper is used as the filter material; consequently, the pleat collapse problem in the National filter was not as acute as with the '807 type filter, if it existed at all. The pleats on the National filter were made on a manually operated pleater and were uniform. The walls of the pleats were not bowed or stressed. The National filter thus did not encounter or teach a solution to the problem of pleat collapse when the pleats are not uniform.

Somewhat similar to the Fricke '265 and Foust '179 patents, which defendants have compared with '807 as involving securing the outer wrap to the outer edges of the pleats, is Fricke et al. patent No. 2,749,948. While not available to defendants as prior art on '807, because not noticed under 35 U.S.C. § 282, we may take note that it was regarded by both plaintiffs' and defendants' experts as the best prior reference, and was cited as a reference by the Patent Office. In this patent, the outer edges of the pleats are bonded to the cover member. The outer cover member is not permeable substantially throughout its length; rather, the outer shell is impervious, but is somewhat shorter than the filter element in order to leave spaces at the top and bottom for the passage of fluid. The pleats of the filter element in Figure 2 of the patent appear to be of uniform length, and nothing in the patent indicates to the contrary. The patent does not recognize the problem of pleat collapse where the pleats are of unequal length, nor teach a solution to this problem. The walls of the pleats are not

under stress and are not bowed to afford the necessary bonding to avoid pleat collapse. The patent does not teach the use of a thermosetting adhesive to bond the outer cover or shell to the peaks of the pleats, nor does it suggest the shrinking of the outer cover or the simultaneous shrinking of the cover and bonding thereof to the outer edges of the pleats, or the use of super-atmospheric temperature for the shrinking and bonding process.

### (2) Prior Art Patents Allegedly Disclosing Pleats With Bowed or Stressed Walls

Defendants assert that Poelman et al. patent No. 2,122,111; Bell patent No. 2,642,187; and Gretzinger patent No. 2,689,652 disclose bowed and stressed pleat walls in pleated paper filters. Defendants also assert that the Bell patent shows the use of thermosetting adhesive in such a filter. Bell '187 does not show bowed or stressed walls. Defendants point in their brief to Figure 2 of this patent. That figure shows curved outer peaks of the pleats, but the walls thereof are substantially straight. Nothing in the patent indicates that these walls are under stress. The outer peaks of the pleats are not bonded to the cover wrapper, but rather the zig-zag ends of the pleats are bonded to the end discs of the filter. A thermosetting adhesive is used to make this bond.

Poelman, the gas mask patent which has been discussed previously in this memorandum, shows as an alternative construction for the radial pleats, in Figure 4, pleats that are all bent over in the same direction. In lines 67–71 of the patent, it is said, "In annular shaped filters, the faces of the plaits of the paper band can themselves be undulated or bent, all in the same direction, for instance as shown in Fig. 4." The outer peaks are not bonded to the cover member; as in the Bell patent, the ends of the pleated element are cemented to the end disks. As has previously been noted, defendants' expert conceded that this patent discloses an air filter which is unsuitable for use in oil filtration.

The Gretzinger patent discloses pleats which are uniformly curved or involuted, all in the same direction. As in the Bell and Poelman patents, the ends of the pleated element are cemented to the end plates, and the outer peaks of the pleats are not bonded to the cover member.

The Bell and Gretzinger patents, as conceded by defendants' expert, are small filters not suitable for use in diesel locomotives. These, as well as the Poelman patent, do not indicate that the pleats are of unequal length, they do not concern the pleat collapse problem presented where pleat walls are of unequal length, and they suggest no solution to that problem.

Defendants have also cited certain other patents which they assert show bowed or stressed walls. These other patents were not noticed by defendants under 35 U.S.C. § 282, and were not admitted into evidence to show prior art but for the limited purpose of construing the file wrapper. It may be noted, however, that these other patents are: Briggs '449; Vokes patent No. 2,279,423; Layte patent No. 2,663,660; and Parker patent No. 2,739,916. Briggs '449 shows in Figure 5 pleats the walls of which are uniformly curved in the same direction. Again, the outer peaks of the pleats are not bonded to the cover member; rather they are cemented to the end discs.

Nothing in Vokes, Layte, or Parker shows bowed or stressed walls. In Figure 5 of the Parker patent, the walls of the pleats are shown to be bent slightly outward rather than straight; however, nothing in the patent discusses or requires this formation, or suggests that the walls are under pressure. Again, the outer peaks of the pleats are not bonded to the cover member; the ends of the pleats are bonded to the end discs. None of these patents discloses pleats of unequal length.

*(3) Prior Patent Allegedly Disclosing Method Suggesting the Method Claims of '807*

Defendants contend that the filter making method of claims 10 and 11 are anticipated by Gretzinger patent No. 2,689,652, which, they state, "discloses the method of maintaining adjacent pleats in spaced relationship by circumscribing a pleated filter element with a cover member or protector strip and shrinking or contracting the cover member about the peripheral portions of the pleats." (Def. Br. 21–22) They state that bonding of the outer edges of the pleats would then be "obvious" in light of the prior art.

The quoted interpretation of the Gretzinger patent is somewhat misleading. That patent shows the use of spiral or involute pleats, running in the same direction, and it is the purpose of the spiral or involute form to achieve substantially uniform sludge pockets between the pleats. The pleats are maintained in spaced relationship by securing the ends of the pleats to the end plates of the filter by adhesive or resin bonding materials. The outer peaks of the pleats are not bonded to the cover, so the cover member itself would not maintain the spaced relationship of the pleats. There is no shrinking of the cover member in the sense of shrinking the actual material of the cover members. But in order to curve the pleats, one alternative method described in the patent is to contract the cover member about the pleated element and rotate it in order to bend the pleats into the spiral or involute form.

*Invention Not Obvious in Light of Prior Art.* I conclude, from this review of the prior art relied upon by the defendants, that none of the prior art cited by the defendants shows or teaches the invention set forth in claims 4, 6, 8, 9, 10, and 11 of the '807 patent. None of this art, considered either singly or in combination, would have made the inventions covered by claims 4, 6, 8, 9, 10, and 11 of this patent obvious to one having ordinary skill in the art to which those inventions pertain at the time when the inventions were made.

None of the prior art patents cited by the defendants recognizes the problem of pleat collapse caused by move-

ment of adjacent pleats together where the walls of the pleats are of unequal length. None of these patents discloses the use of pleated filter material having pleats of unequal depth, which pleats have walls that are stressed and bowed for the purpose of permitting adequate bonding of the outer wrap or cover to the outer peaks of the pleats in order to overcome the pleat collapse problem where the pleats are of unequal length.

None of the prior art patents cited by defendants shows or teaches the method step of simultaneously shrinking the cover member or outer wrap and bonding it to the peripheral portions or outer peaks of the pleats, and none of these patents shows the carrying out of the latter step at superatmospheric temperature.

Relevant features of the prior art taught securing of the outside pleat edges to the cover wrapper in order to maintain the pleats in spaced relationship. It also taught the use of thermosetting adhesive, though on the end discs rather than on the cover member and not used to achieve a combined shrinking and bonding process. It also taught pleats that were bent or curved in the same direction, with the ends of the pleats secured to the end plates of the filter, but not with the outside edges of the pleats bonded to the cover member. And it taught contracting the cover wrapper about the pleated element and rotating it in order to produce curved or involute pleats.

Given these combined features of the prior art, I think invention was involved in conceiving the claims in question of '807. Bonding of the pleats to the cover member could not be achieved under prior patents where the pleats were of unequal length, and no prior art was concerned with this problem or made any attempt to overcome it. The curved or bent pleats in the prior art bear little resemblance in either appearance or purpose to the bowed and stressed pleats of '807 which are substantially radial, the bowing occurring on the longer walls to permit bonding of the cover to the edges of the shorter pleats. The prior art's contraction of a cover member about radial pleats and rotation thereof to produce curved pleats bear little if any resemblance in either method or purpose to the simultaneous shrinking and bonding of the cover to the pleat edges of the '807 patent.

I find that Briggs was inventive in achieving a cover wrapper which can be secured to the edges of the pleats where the pleats are of unequal length, and in conceiving the '807 methods which produce this result. If this solution were one which would have been obvious to one with normal skill in the art, why hadn't others in fact thought of it? Others were attempting to produce a marketable paper filter for diesel locomotives at the time this invention was made; they had not, however, discovered the '807 form of the paper filter or its process. The Stone filter produced under '807 has met with impressive commercial success attributable to the '449 and '807 inventions, with sales growing at a substantial rate from year to year. The defendants' own imitation of the Stone filter (discussed subsequently in this memorandum) is further testimony to its merit. The railroad industry, at the time of this invention, had been interested in obtaining an improved filter for diesel locomotives, and the railroad tests of the Stone filter together with its commercial success show that this filter has met the "felt want" of the industry.

Defendants assert that there is no "advance" in the art in using pleats of unequal length; they state that this rather is a step "backward." There are several answers to this contention. Plaintiffs aptly point out that while pleat walls of unequal depth give no practical advantage, neither does having unbalanced wheels on an automobile. It is an advance in the art, however, to overcome such conditions which are present as the result of imperfect manufacturing techniques. Defendants are perfectly free under the terms of the '807 claims to make a filter with pleat edges bonded to the cover member using

pleats of equal depth. Apparently, however, like plaintiffs, defendants have not found a commercially feasible way to produce pleats of uniform depth. It is the solution to this problem that has made possible the marketing of a paper filter for use in diesel locomotives by both plaintiffs and defendants.

 The purpose of the patent laws is to protect invention, but not to give the patent monopoly to anyone on mechanical methods known in the art and which should be available to everyone. The temporary monopoly of the patent laws, however, is extended to encourage significant contribution to the relevant art. These claims are entitled to that protection.

*Specifications of '807 Are Clear, Accurate, and Complete.* Defendants contend that the '807 patent is invalid for failure of the specification to comply with the requirements of 35 U.S.C. § 112, which provides as follows:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

Defendants argue first that the patent withheld certain information which Briggs had concerning the effect of paper freshness, pleater speed, and braking force upon the evenness of pleats produced by the Chandler pleater; exaggerates the phenomenon of uneven pleats; states the "unfounded conclusion" that "Substantially all commercial paper pleating machines produce variations in the depths of the pleats * * *"

(col. 1, lines 31–32 of the patent); and therefore created an artificial problem regarding uneven pleats in order to obtain the grant of a patent.

 This argument is without merit. There is no evidence as to when Briggs learned that paper freshness, pleater speed, and braking force affect the evenness of pleats produced by the Chandler pleater. He had used the pleater for about six or seven months prior to filing of the patent application, and he may or may not have known of these effects at that time. Under 35 U.S.C. § 282, defendants have the burden of proof on this issue. Moreover, even if Briggs were aware of these factors when the patent was filed, they are not matters necessarily relevant to the patent. Briggs stated on cross-examination as follows:

"Q. Is it your testimony that a Chandler pleating machine can be operated at speeds up to a given limit and produce even pleats?

"A. The Chandler pleater doesn't make even pleats.

"Q. It doesn't make even pleats at any speed?

"A. I have never seen them."
(Tr. 1672) Thus, even if Briggs knew, when the patent was filed, that paper freshness, pleater speed, and braking force affect the evenness of pleats produced by the Chandler pleater, it was and is his opinion that such a pleater doesn't make even pleats. Moreover, the point of the patent clearly appears to be that the manufacturer does not want to produce pleats slowly. If he were willing to do so, he could produce them manually and get even pleats.

Defendants say that the patent states an "unfounded conclusion" in the statement that substantially all commercial pleaters produce variations in the depths of the pleats. Briggs testified that his own experience was confined to the Chandler pleater, so that he could not testify from his own experience with regard to any other pleater. When questioned about a "Rotary" pleater, however,

Briggs stated that he was "sure it would" produce uneven pleats. Defendants have not shown or attempted to show that any commercial pleater could or can produce even pleats.

There is no evidence whatever that the problem of uneven pleats dealt with in the patent was the "creation of an artificial problem." Such a creation would have been pointless; anyone who could produce even pleats would not infringe the patent.

Defendants argue secondly that what the patent discloses is not the best mode of practicing the alleged invention of the patent, since the commercial Stone filters use special filter papers not disclosed in the '807 patent, and do not use spaced bands of adhesive or thermoplastic adhesive, both of which are disclosed and claimed in the '807 patent as significant inventive features. Defendants do not cite to the record to show what they mean by "special filter paper," and they do not attempt to show that these papers were something known to Briggs and withheld from the Patent Office when the patent was filed. On cross-examination, Briggs was questioned at some length about the filter papers used in the Stone filters. The patent was filed on December 3, 1957. During 1957, Briggs testified, the Blandy Paper Company was supplying him with trial runs of paper on which he had specified the ingredients. Some paper developed in 1957 is still being used, but Stone uses several different kinds of paper, because railroads use different types of basic oil, and no one filter medium is appropriate to all types of oil. One type of paper used by Stone about which Briggs was questioned on cross-examination was developed after 1957. The evidence does not indicate that Briggs withheld information from the Patent Office about "special filter papers." It appears, rather, that at the time the patent was filed, Briggs was still working on the problem of what kinds of filter paper to use.

Defendants have not shown that when the patent was filed Briggs considered it better to coat the entire wrap rather than to use spaced bands of adhesive. On cross-examination, Briggs was asked whether the use of spaced bands of adhesive had been dropped in the Stone commercial construction, and Briggs stated "We dropped it in the construction because it is more economical to coat the whole sheet." (Tr. 879) This is the only evidence on this point, and it contains no indication that Briggs misled the Patent Office.

As to the use of thermoplastic adhesive, which the patent describes as used on the side seam of the wrapper, Briggs testified that in the Stone filter a thermosetting resin is used on both the wrapper and the side seam. There is no evidence as to when it was determined that this procedure was more desirable than that described in the patent.

Defendants argue, thirdly, that the patent does not contain a full, clear, concise, and exact explanation to one skilled in the art as to how to practice the alleged invention of claims 10 and 11. For one thing, defendants assert, the patent says nothing about paper freshness, pleater speed, and braking force; but again, the evidence does not show that Briggs realized the effects of such factors when the patent was filed. Moreover, the relevant fact in the patent is that the pleater produces uneven pleats; it is not a patent endeavoring to show how to produce even pleats but showing how to make a workable filter with uneven pleats. Defendants next say that the method descriptions of '807 are incomplete because in order to press the wrapper onto the peripheral portions of all the pleats, Stone employs a ram with 1200 pounds of force, and the ram is not disclosed in the patent. Defendants have not shown, however, when Briggs first decided to use such a ram. The patent states, at lines 39–44: " * * * it is highly desirable that all of the peaks engage either the core 13 or the cover member 12. This is accomplished by causing the cover member 12 to impose sufficient stress upon the longer of the walls 14 to cause them to assume a bowed condition as will be exemplified by the wall 14a

of Fig. 3." The patent also states that prior to the shrinking and bonding process, the cover is contracted about the pleats so as to contact the outer edges of all the pleats. (2d col., page 1 of the patent) I consider that one skilled in the art would not have a difficult time devising a method of putting the "sufficient stress upon the longer of the walls" described in the patent. That Stone uses a particular kind of trough which is closed by a pneumatic ram in order to press the wrapper around the filter element does not mean the patent description is vague. Defendants use a slightly different method of producing the same result, indicating that plaintiffs' precise method is not essential. Defendants mention, finally, that in the Stone process, a special catalyst is used in the thermosetting adhesive to obtain bonding while shrinking, but there is nothing about such a catalyst in the '807 patent. Again, however, defendants have not shown when the catalyst was first employed.

Defendants say that the patent is "vague" because it discusses "shrinkage" when, they say, the cover member actually becomes larger. The evidence shows, however, that the cover members become larger when adhesive is applied and then shrink as the moisture evaporates therefrom. Defendants say the term "shrinkage" is vague, too, because the experts disagree as to whether the term means actual shrinkage, physical squeezing, or simply the rolling up of a flat article. The term is not vague; the shrinkage which the claims in question concern, as is made clear in the patent, occurs as the moisture in the adhesive on the cover wrapper evaporates. Briggs' testimony on cross-examination, at pages 927–28 of the transcript, similar to the description regarding shrinkage in the paragraph beginning at line 57 of the patent, clearly shows that the shrinkage of the cover member occurs after the cover member is coated with adhesive, and while the moisture in the adhesive is evaporating.

Finally, defendants say that plaintiffs have maintained that "grooves" are "essential" to make a paper filter work; that '807 does not disclose the use of grooves; and that therefore the patent discloses an inoperable filter. The testimony, however, was that a paper filter with inner pleats in contact with one another will not work without grooves to permit the flow of liquid therethrough. The claims of '807 do not specify inner pleats in contact with one another; nor do the drawings of the patent show inner pleats in contact with one another. The '807 invention could be employed in filters with various arrangements of the radial pleats, and the patent does not limit itself to a particular placement of those pleats.

Defendants have not established that Briggs created an "artificial problem" to obtain the '807 patent; that he withheld any information concerning the best methods for making the '807 filter; that the patent descriptions are inadequate or vague; or that the patent discloses an inoperable filter. The patent has not been shown invalid for failure to meet the requirements of 35 U.S.C. § 112; its disclosures are complete, accurate, and sufficient to meet the requirements of the statute.

## INFRINGEMENT OF THE PATENTS BY THE ACCUSED STRUCTURES

*The '449 Patent*

■ Plaintiffs have the burden of proving infringement of the patents by a preponderance of the evidence. Becker v. Webcor, Inc., 289 F.2d 357, 360 (7th Cir. 1961), cert. denied, 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1962).

■ It is well settled that in proving infringement, it must be established that the words of the claims find a response in the accused device, and also that a real identity exists with regard to means, operation, and result. Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 194 F.2d 945, 947 (7th Cir. 1952).

Claim 9 of the '449 patent reads as follows:

"A filter element in the form of a tubular body comprising a web of filter material folded to extend back and forth between the inner and outer peripheral surfaces of the tubular body with the folds of the web at the inner surface of the tubular body being juxtaposed and in contact with each other, and well defined grooves formed in the web at the contacting surfaces of the inner folds, said grooves extending in a generally radial direction with respect to the tubular body to provide passages between the contacting surfaces and thereby permit the free flow of a fluid between such surfaces."

It has been conclusively established by the evidence that each and every mechanical element of this claim finds a response in the accused structure, and that a real identity exists as between claim 9 and the accused structures with regard to means, operation, and result. Claim 9, with complete accuracy, describes the accused filter. Defendants have introduced no evidence that contradicts plaintiffs' evidence with regard to this claim.

Claim 10 of '449 reads as follows:

"A filter element in the form of a tubular body comprising an elongated web of filter material folded to extend back and forth between the inner and outer peripheral surfaces of the tubular body with the folds thereof extending longitudinally of the tubular body and the folds of the web at the inner surface of the tubular body being juxtaposed and in contact with each other, and well defined grooves formed upon the surface of the filter material which is exposed to and in communication with the bore of the tubular body, said grooves extending lengthwise of the elongated web and providing flow passages between the contacting inner folds."

While some of the phrasing of claim 10 differs from that of claim 9, these claims are in substance identical. What I have said with regard to claim 9, therefore, applies with equal force to claim 10. Plaintiffs have conclusively established that the accused structure infringes claim 10, and defendants have introduced no evidence whatever contradicting plaintiffs' evidence.

Claim 11 of '449 reads as follows:

"A filter element in the form of a tubular body comprising an elongated web of *ribbed cellulosic filter material* folded to extend back and forth between the inner and outer peripheral surfaces of the tubular body with the folds thereof extending longitudinally of the tubular body and the ribs extending in a generally radial direction with respect to the tubular body, the folds of the webs at the inner surface of the tubular body being juxtaposed and in contact with each other." (Emphasis supplied.)

With the exception of the words "ribbed cellulosic filter material," claim 11 is in substance the same as claims 9 and 10 of the patent. Plaintiffs have conclusively established that the filter material used in the accused structures is "ribbed cellulosic filter material."

One has only to look at the filter material in the accused structures to see that the paper is ribbed. Defendants' expert testified that the defendants' filter material was not ribbed; defendants described their material as corrugated. Plaintiffs' expert disagreed with defendants' expert, stating that "where there are peaks and valleys, in my judgment that would be a ribbed material." (Tr. 1672–A) The peaks and valleys of defendants' filter material perform exactly the same function in exactly the same way as the "ribs" of the patent, namely, to form passages for the flow of oil into areas where adjacent pleats are in contact with one another. In his testimony, Briggs showed that when ribbed paper is folded together in the manner of this patent, the high points of the ribs or corrugations meet, leaving well defined grooves between the stretch-

es of material for the flow of oil. The defendants' filter material is so corrugated or ribbed that these high points likewise meet at the folds of the paper, permitting the flow of oil through the grooves even though the pleats at the inner folds are in contact.

In examining the evidence to ascertain whether the filter material of the accused structure is the ribbed filter material of the patent, I have found only one feature of the patent from which it could be argued that defendants' structures lack such ribs. Defendants have not made this argument, but for the sake of completeness it should be noted that in the drawings of the patent, the filter material is shown as having the high points at the same points on both sides of the filter material, and the low points at the same points on both sides of the filter material. That is, the ribs have been made by compressing the material so that it is alternately thin and thick. The paper of the accused structure, in contrast, has the same thickness throughout, with the high points or peaks on one side of the paper being the low points or valleys on the other side of the paper. The language of the patent, however, does not require the paper to be constructed as shown in the figures. And I find that the defendants' filter material is ribbed in the sense of the patent, because it has peaks and valleys which function in the same way as the ribs required by the claims. The difference between the ribs of the accused structures and the ribs of the drawing are insubstantial and insignificant; the real substance of the invention is retained. Cf., Ingersoll Milling Mach. Co. v. General Motors Corp., 110 F.Supp. 12, 33–34 (N.D.Ill. 1952), affirmed, 207 F.2d 42, 46 (7th Cir. 1953).

Defendants contend that the filter element of the accused structures is not ribbed because corrugated paper does not provide the advantages of the grooved material of the '449 patent. They state that with the latter, whenever the pleats collapse and the wadding surfaces touch, the grooves provide oil passages. But Briggs found, they say, that when corrugated paper was used, there was still a problem of pleat collapse; he devised the '807 procedures to solve that problem. Defendants' argument is based upon a misconception. As is clear in the '807 patent, the problem which that patent was designed to solve arose when the outer edges of the pleats moved, the pleats then sticking together as an effect of adherent cake formation. The '807 patent does not concern the problem of permitting the flow of oil through the filter where the inner pleats are in contact. The ribs of defendants' corrugated paper function in the same way as the ribs of the patent; they form well defined grooves between the stretches of the material when folded to make pleats, and they permit the flow of oil between contacting surfaces of the material.

The accused structure also employs "cellulosic filter material" as required in claim 11. Defendants' expert admitted that the filter paper used in the accused structure is cellulosic filter material. The testimony was as follows:

"Q. Would you say, Mr. Lauer, that the corrugated filter paper used in the defendants' accused structure is cellulosic filter material?

"A. In the broad sense of the term, yes, because cellulose is a basic constituent of paper, the principal constituent of paper." (Tr. 1410)

Plaintiffs' expert also stated that filter paper is cellulosic filter material. It is clear from the evidence that cellulosic filter material is a broad term that includes paper filter material.

Thus, each and every mechanical element of claim 11 find a response in the accused structure, and a real identity exists with regard to means, operation, and result as between this claim and the accused structures.

Claim 12 reads as follows:

"A filter element in the form of a tubular body comprising an elongated web of ribbed *cellulosic wadding* folded to extend back and forth between the inner and outer pe-

ripheral surfaces of the tubular body, with the folds thereof extending longitudinally of the tubular body and with the inner folds being juxtaposed and in close contact with each other, the stretches of web intermediate the folds lying in planes extending substantially radially of the body, and the ribs extending lengthwise of the web and radially of the tubular body to form passages for a fluid between the inner contacting folds." (Emphasis added)

The accused structures infringe claim 12 of the patent. The evidence shows that each and every mechanical element of this claim finds a response in the accused structures and there is a real identity with regard to means, operation, and result. The only difference in substance between this claim and the preceding claims discussed is that this claim uses the words "cellulosic wadding." While the accused structures do not employ "cellulosic wadding," they employ an equivalent.

The evidence is somewhat conflicting as to whether the defendants' filter material is "wadding." The chart prepared by plaintiffs' expert comparing the claims of the patent with the accused structure interprets the accused structure as employing cellulosic wadding, and Briggs testified on cross-examination that to him ribbed paper and ribbed cellulosic wadding are the same thing. Plaintiffs maintain that the filter paper in the accused structures functions in the same way as the wadding of claim 12.

Defendants' argument that its filter material is not wadding regards the definition of cellulose wadding appearing in Briggs patent No. 2,092,548, which was copending with the '449 patent and which is referred to in the '449 patent. The '548 patent states the following:

" 'Cellulose wadding' is the name applied to a fibrous material composed of a plurality of superimposed extremely thin, gauze-like, webs of loosely interlaced cellulose fibers (i. e., cellulose fibers obtained from wood or like vegetable matter by a process of chemical digestion of the raw cellulose-containing material with chemicals adapted to dissolve or render soluble the non-cellulosic constituents of said material, with subsequent removal of the so-solubilized non-cellulosic constituents from the so-called cellulose fibers). The individual webs are produced by applying a film of low density aqueous cellulose pulp suspension to the surface of a drying roll, driving off the water, and removing from the drying roll the resulting 'cobweb' of fibers as a tissue, and the wadding is produced by superimposing on each other a plurality (e. g., twelve) of such gossamer webs. This same material, in a body containing more laminae, is sometimes called 'crepe wadding'." (Col. 1, lines 32–53 of the patent)

Plaintiffs' expert testified on cross-examination that the method described above was pretty much the same method that was used in 1920, in Monroe, Michigan, to produce a very thin paper, but that the matter of putting a number or a dozen webs of this material together was "something a little different." (Tr. 368) He further testified as follows:

"Q. Wadding is not the same as filter paper, is it?

"A. I think in a technical sense it is not the same as.

"Q. The accused filters do not employ cellulose wadding, is that correct?

"A. Not such as described in that patent that we looked at." (Tr. 381)

I conclude from this testimony that the filter paper used in the accused structures is not cellulose wadding as that term is described in the '548 patent. And I think it is reasonable to conclude that Briggs used the term in the '449 patent as meaning the same thing as it meant in the copending '548 patent. But wadding and defendants' filter element are both paper filter elements, and they function in the same way in a filter. Avoidance of the precise, literal terms

of a patent claim does not preclude infringement where the change is insubstantial and the real substance of the invention is retained. Ingersoll Milling Mach. Co. v. General Motors Corp., 110 F.Supp. 12, 33–34 (N.D.Ill.1952), affirmed, 207 F.2d 42, 46 (7th Cir. 1953).

The filter paper in the accused structures is equivalent to the "wadding" of claim 12; it performs the same function in the same way as the "wadding." This variation from the patent is consistent with its being in substance the same thing. Cf., Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 96 F. Supp. 70, 74 (N.D.Ill.1951), affirmed, 194 F.2d 945 (7th Cir. 1952).

I thus find with regard to the claims of the '449 patent that claims 9, 10, 11, and 12 are infringed by the accused structures.

Defendants have argued that the patent requires cellulosic wadding in all its claims. I have not discussed this argument above, as it was better to consider it after describing the contentions with regard to claim 12.

Defendants state that the accused structure employs as the filter material corrugated, resin-impregnated paper; that this type of filter material is not specifically set forth in the patent, and that therefore, the accused structure does not infringe the patent. This argument, however, lacks merit; claims 9, 10, and 11 of the patent use terms which are inclusive of the type of filter material used by defendants.

Nor is there merit in the contention that the term "cellulosic wadding" must be "read into" all the claims of the patent. That term is used only twice in the patent, and only once in the claims. The patent usually refers to "cellulosic filter material." The latter is described, in the third paragraph, right column, page 2 of the patent, as "similar to the wadding disclosed" in the copending '548 patent, but differing from that material in that the grooves of the material run in different direction in the two patents. I do not consider that by this statement, Briggs meant to confine the '449 patent to the specific material of the '548 patent. I think, rather, that he was simply describing the kind of material he was then using. The evidence shows that the filter paper now used by both plaintiffs and defendants had not been developed. Filter paper was used in the laboratory, and Briggs had certain patents concerning filter paper, but not such as now used by plaintiffs and defendants. An invention is not patentable unless workable; accordingly, Briggs had to include in the disclosures of '449 a description of a filter material that would do what the claims disclosed, and he thus referred to the '548 wadding. The thrust of the patent, however, pertains to the use of radial grooves in a radially pleated paper element, with the pleats arranged so that the inner edges are juxtaposed. It would make no sense to limit this patent to the particular composition of the element disclosed as used by the inventor, and nothing in the patent suggests such a limitation.

*The '807 Patent*

The evidence establishes that the accused structures infringe the claims in question of the '807 patent. Plaintiffs have sustained their burden of proving by a preponderance of the evidence that the accused structures infringe these claims.

With regard to the article claims, number 4, 6, 8, and 9, claim 4 reads as follows:

"A filter comprising a permeable impregnated paper filter element having axial pleats with walls of unequal depths defining a plurality of inner and outer peaks, said outer peaks being spaced apart and lying substantially in a cylinder, a substantially uniformly permeable core disposed within said element for engagement with said inner peaks, an annular cover member permeable substantially throughout its length embracing said outer peaks throughout their length, and an adhesive bonding said cover member to said outer peaks."

The evidence clearly establishes that each and every mechanical element of this claim is present in the accused structure; there is a real identity with regard to means, operation, and result as between this claim and the accused structures.

The only feature of claim 4 which defendants have contested as not appearing in the accused structures is the feature of "walls of unequal depths."

The evidence clearly establishes that the accused structures have "axial pleats with walls of unequal depths." Mr. Fishleigh, plaintiffs' expert witness, testified that he had checked the pleat lengths in the Allied plant as the pleated material came from the pleater, as it came from the curing oven, and later in the samples of defendants' filter. He found by measurement and by indication of the way the material reacted in the finished structure clear indication that the walls of the pleats are of unequal depths. He testified that he had seen pleats in both the plaintiffs' and defendants' structures that he would estimate to be as much as a sixteenth of an inch variation from other pleats. He further testified that there is, in plaintiffs' exhibit 75, one of defendants' filters, "a noticeable difference between the amount of curvature and bending of various of the pleats by merely looking at the end of it." This noticeable curving and bending of the pleats is clearly a result of the pleat walls being of uneven depth. Mr. Fishleigh testified that he used a ruler to measure the pleats as they came through the assembly line, placing the ruler across the pleats to see if there was light under the ruler. As the pleats left the pleater, Mr. Fishleigh testified, he looked at them from the side and observed some differences. While he did not ask to have the pleater stopped, so that he could measure with a feeler gauge, he "saw what [he] could estimate" and took measurements with a ruler. He estimated variations in pleat length at this state to be as much as a sixteenth of an inch, and testified that the same type of irregularity in the pleats existed when the pleats came through the oven. He stated that he had watched

a great many pleats go through the line and watched them from the beginning with the matter of pleat evenness in mind. Mr. Fishleigh testified that the adhesive layer on the defendants' cover is about five or six thousandths of an inch in thickness, and that the amount of adhesive must be controlled to avoid plugging up the perforations of the cover member. He testified that pleats would be substantially uniform where the variation in pleat depth was about five-thousandths of an inch. Mr. Briggs testified that the Chandler pleater could not produce even pleats, and his testimony was uncontradicted. Defendants use a Chandler pleater.

Defendants rely upon the testimony concerning two exhibits as showing that the pleats in the accused structure do not have pleat walls of unequal depths. The first of these exhibits, defendants' exhibit 11, is a complete set of pleats which had been pleated on the Chandler pleater and which had not gone through the curing oven. Defendants' expert testified that he measured the pleats of this exhibit in the Allied plant as it lay on a perfectly flat surface, with a six-inch scale, and that the pleats "either touched or were exceedingly close to touching that scale. * * *" (Tr. 1190) He did not measure any other exhibit. Plaintiffs' expert testified that he had measured the same exhibit on a flat surface out of the courtroom, and he measured it in court, though a perfectly flat surface the size of the exhibit was not used, and he testified that there were noticeable differences in the pleat depth. He testified that there were even more noticeable differences in plaintiffs' exhibit 72-A, which was taken from the Allied line in the presence of representatives of the plaintiffs, while defendants' exhibit 11 was a sample not taken in the presence of any representative of the plaintiffs. Mr. Resch, a witness for the defendants, testified that DX 11 was "a representative sample of the accomplishment of that machine," but on cross-examination, he could not say how fresh the paper was that was used to make this sample, how fast the pleater was operated

when the sample was produced, or how much braking force was applied when the sample was produced. Nor could Mr. Lauer testify to these factors, though he was present when the sample was made. The evidence shows that these factors can affect the evenness of pleats produced by a Chandler pleater. Consequently, that the pleats on DX 11 show greater evenness than on other samples could be explained by the manner in which the pleats in this sample were produced. I do not think that defendants' expert's testimony that when he measured this sample in the plant, the pleats either touched his scale or were "exceedingly close" to touching it contradicts the evidence of plaintiffs' expert to the effect that he found pleats in the Allied plant varying in length up to a sixteenth of an inch, observing the pleats both before and after they were cured, and in the finished product.

The other exhibit relied upon by the defendants is plaintiffs' exhibit 74, a sample of pleats which have had the cover bonded to the pleats under a flat heated platen. Plaintiffs' expert testified, with regard to this exhibit, on cross-examination, that the pleats therein had been pretty well equalized in the course of the operation under the platen. He admitted that he had not measured the pleats of this particular exhibit before they had been assembled to the cover; but he also said that the pleats he observed in the plant prior to the operation under the platen were uneven. Defendants contend, from this testimony, that the Allied manufacturing operation produces even pleats, that the article claims of '807 define a completed filter, and that evidence of pleat unevenness at the pleater is immaterial.

The testimony with regard to PX 74 does not contradict the plaintiffs' evidence showing that the accused structure has pleat walls of unequal depth. When the pleats, in the Allied process, are secured to the cover member under the flat platen, the pleats are pressed downward, so that the cover will contact all the pleats. While this process, as plaintiffs'

expert pointed out, tends to equalize the pleats, clearly the operation merely tends to equalize the distance between the outer and inner edges of the pleats; it does not change the length of the pleat walls. The pleat walls were of unequal depths before going under the platen, and they are still of unequal depth afterwards. The longer walls are merely bowed.

Claim 6 reads as follows:

"A filter as set forth in claim 4 wherein said adhesive is thermosetting."

The evidence establishes, without contradiction by defendants, that the adhesive used in the Allied structure to bond the cover to the pleats is thermosetting.

Claim 8 reads as follows:

"A filter as set forth in claim 4 where said walls are under stress."

The uncontradicted evidence shows that the walls of the accused structure are under stress during the course of manufacture, when the pleats are under the platen, when the filter is squeezed to fit into the side-seam sealer, and when the adhesive on the cover member is drying and shrinking the cover member about the pleats. The evidence also shows that the walls are under stress during the course of operation of the filter, because of the pressure of the oil flowing through the filter. The walls are not under stress in the partially dissembled exhibits. The core can easily be slid out of the filter element, because the resin impregnation has set and the walls are more rigid than when originally processed. I think that the fact that the walls are stressed during the manufacturing process and during operation of the filter means that the accused structures infringe this claim.

Claim 9 reads as follows:

"A filter as set forth in claim 4 wherein said inner peaks engaged said core and certain of said walls are bowed."

The evidence establishes that the walls of the pleated element are bowed, to varying degrees. Plaintiffs' expert so testified, and the bowing can be seen in ex-

hibits of the accused filters. The evidence also establishes without contradiction that the inner peaks engaged the core when the filter is in use and that they must also engage the core during the process of shrinking and bonding the outer cover about the pleats. Defendants, again, point to the fact that the core in some of the exhibits can be slid out of the filter. As we have seen, however, the resin impregnation in the paper element has set, so that the walls are more rigid than when originally processed. I find that because the inner peaks engage the core during manufacture and when the filter is in use, and because certain of the walls of the accused filter are bowed, claim 9 of the patent is infringed by the accused filters.

Claim 10, the first method claim, reads as follows:

"A method of maintaining adjacent pleats of an annular filter element in spaced relationship comprising circumscribing said element with a cover member and simultaneously shrinking said cover member about and bonding it to peripheral portions of said pleats."

The evidence establishes that each and every mechanical element of this claim is present in the accused structures. The pleats of the accused structure are held in spaced relationship by being bonded to the cover member. The evidence regarding the manufacturing process of the accused structures shows that the filter element is circumscribed with a cover member, and that the cover member is simultaneously shrunk about and bonded to the peripheral portions of the pleats.

Plaintiffs' expert testified as follows with regard to what he observed in the Allied plant and what deductions he made, as an engineer, with regard to the Allied process:

A section of pleats, after going through the curing oven, and still hot, is placed upon a flat, hard rubber surface, with a rim about it to hold the pleats at the desired pitch. A cover member, which has been coated in a roller coater with a thermosetting resin applied to all but about an inch on one edge for overlap, is laid on top of the pleats. This unit is then brought up against a heated platen, with enough pressure to insure contact of the cover member with all the pleats. The heated platen is applied to the cover for about a minute. When the pleats leave this platen, the pleats are not uniformly secured to the cover, and some of them were observed by Mr. Fishleigh to be loose. This assembly, still very flexible, indicating that bonding is incomplete, is then placed in a horse-shoe shaped jig, where the tubular core is inserted. The ends of the pleats are brought around the core and stapled together. Adhesive is applied to the overlap portion of the cover. With the bonding at this stage still incomplete, the unit is then picked up and one end of it squeezed to less than 6½ inches in diameter, the rest of the unit being somewhat greater than 6½ inches in diameter as then held. The smaller end of the assembly is placed into a metal cylinder, the side-seam sealer, which has a 6½ inch diameter. A pneumatic ram is used to force the unit into the cylinder. The fit is rather tight. The walls of the cylinder are hot. A rod which is very hot is brought against the seam of the cover to seal it. The assembly is in the side-seam sealer for about a minute. Sometime subsequent to the placing of this assembly in the 6½ inch diameter cylinder, the diameter of the cover member shrinks. Measurements made in the courtroom show that it shrinks as much as an eighth of an inch in diameter. The circumference of the cover member, by mathematical law, shrinks more than three times the degree of the diameter. The cover member of the unit shrinks about the pleated element, applying pressure across the pleats, and the bonding of the cover member to the pleats occurs while this shrinkage is taking place. Clearly, the bonding and shrinking occur simultaneously as the adhesive dries.

Defendants argue that the cover member is not circumscribed about the filter

element during the bonding and shrinking process.

The evidence shows that although the bonding of the cover member to the pleated filter element is begun under the heated platen when the cover and element are lying flat, the cover and element are, immediately thereafter, circumscribed about the tubular core. It would be splitting hairs to find that this process does not amount to *"circumscribing said element with a cover member* and simultaneously shrinking said cover member about and bonding it to peripheral portions of said pleats." The bonding and shrinking of the cover member no doubt begin under the heated platen, but they continue after the cover is circumscribed about the pleated element and the core.

Defendants contend that the bonding of the cover member to the peripheral portions of the pleats occurs while the pleats are in the flat box described above and while the heated platen presses the cover member onto the tops of the pleats. Defendants' expert testified that the only shrinking of the cover member which he saw occurred at this point in the manufacturing process. More convincing on this point, however, was the testimony of plaintiffs' expert that the bonding began at the heated platen but, as could be seen from the looseness of some of the pleat edges and from the flexibility of the unit, the bonding in his judgment was not complete when the unit was placed in the horse-shoe jig or at the time it was placed in the side-seam sealer. Defendants' expert himself testified on cross-examination that the unit was a snug fit, in the side-seam sealer, and he himself, when asked to measure defendants' exhibit 16, found it smaller in diameter, in places by about a sixteenth of an inch, than 6½ inches.

Defendants rely also upon certain measurements of cover members in three exhibits as showing that the only shrinkage of the cover member that occurs during the manufacturing process occurs when the heated platen is applied to the flat cover member to press it onto the pleats. These measurements show that a cover member not bonded to the pleats is slightly larger than a cover member which has been bonded to the pleats under the heated platen but not further assembled, and that a cover member in the final form, with cover and pleats circumscribed about the core, is *larger* than the first cover which was not bonded to the pleats. Defendants assert that these measurements show that the cover member grows rather than shrinks after being under the heated platen.

Plaintiffs' expert, however, testified that these measurements could be explained. He found at the Stone plant that when moisture was applied to a cover member (which is similar in composition to defendants' cover members), the cover member grows. As the moisture is driven off by heat or evaporation, the cover member shrinks. He testified that he could give an engineering explanation for the measurement differences which defendants had shown regarding the cover members. He stated that the cover member which was affixed to pleats, but not further assembled, would naturally be smaller than a cover member which had not been so affixed, because it would first grow when the adhesive was applied and then, meeting little resistance from the pleats to which it was affixed, it would shrink to a size smaller than the original cover. But the cover in the final assembly, which was larger in measurement than the original unassembled cover, would have first grown as an effect of the adhesive, and then would shrink, but because of the resistance of the pleated material with the core inside, it would not shrink as much as the cover affixed to the pleats not circumscribed about a core. And it would be larger than the original cover, because though it had shrunk from the size to which it grew under the adhesive, it had not shrunk back to the original size. Mr. Fishleigh also stated that the resistance of the pleated element and the core inside indicated to him that there was a pressure on the pleats during the drying process. The smaller size of the cover assembled only to the pleats would indicate that the

shrinking of the fully assembled cover would have been greater absent the resistance of the filter element and the core, and so must have exerted pressure on the pleats during the drying process.

Against this testimony of plaintiffs' expert, the measurements relied upon by defendants to show an absence of shrinkage except at the heated platen actually support the contentions of the plaintiffs regarding shrinkage of the cover member about the pleats. Although Mr. Fishleigh testified that he had not measured a cover member to which adhesive had been applied at the Allied plant, I consider that his observations as an engineering expert were sufficient to support his conclusions that a "stretching" occurred in the cover member of the accused filter when it was coated with adhesive, and that the subsequent shrinkage and bonding occurred at the same time.

Claim 11 reads as follows:

"A method as set forth in claim 10 wherein said shrinking and bonding are effected at a superatmospheric temperature."

The evidence is uncontradicted that the temperature of the pleats and cover member are superatmospheric when under the heated platen and that the temperature in defendants' side-seam sealer is superatmospheric.

Thermosetting resin cures at superatmospheric temperature, although the evidence regarding plaintiffs' manufacturing process shows that in the Stone filter the bonding and shrinking of the cover member about the pleated element continue to some extent after the filter is processed. Thus, it may be the case with regard to the accused filter, too, that the bonding and shrinking continue to some extent after the filter is taken from the side-seam sealer. There are no measurements in evidence to show the diameter of the Allied filter at the time it leaves the side-seam sealer.

Defendants have not argued that the shrinking and bonding are *not* effected at superatmospheric temperature because some shrinking and bonding may continue at atmospheric temperature; but

for the sake of completeness I take note of this point and find that the shrinking and bonding are "effected" at superatmospheric temperature where the processes are (necessarily) begun at such a temperature, even though they may continue to some extent at atmospheric temperature.

Each of the method steps recited in claims 10 and 11 of the '807 patent is followed, in both term and substance, in the process used in making the accused filter. The method steps employed in the Allied process accomplish the same functions in substantially the same way as the corresponding steps recited in claims 10 and 11.

I find from the evidence that each and every mechanical element of claims 4, 6, 8, 9, 10, and 11 is present both in term and in substance in the accused structures, and that the means, operation, and result are identical as between the '807 patent claims and the accused structure. The elements in the accused structure perform the same functions in the same way as the corresponding elements recited in the claims. The accused structures infringe the '807 patent.

## IMITATION OF THE STONE FILTER

Plaintiffs have alleged that defendants' infringement of the patents in suit is wanton and wilful. They contend that the accused structures were deliberately copied from the Stone filter.

I find from the evidence that intentional imitation of the Stone filter is attributable to defendants Allied, M & J, and Superior. These companies are closely interrelated, with common ownership and control, and personnel from both M & J and Superior participated in the preliminary investigation of the paper filter business and in the formation of Allied. They have worked closely with Allied since its formation, personnel have transferred from one to another of these companies, and all three are involved in the evidence showing intentional copying of the Stone filter.

*Similarities and Differences in the Allied and Stone Filters.*

At the outset, it should be observed that the Allied and Stone filters are very similar in structure, and the processes used in their manufacture are also very similar.

Both filters are approximately thirty inches in length; they employ a ribbed, resin impregnated, radially pleated paper filter element, with the ribs extending radially of the core; in both the inner edges of the pleats are in contact and in engagement with a perforated center tube or core; both have the outer edges of the pleats bonded, with a thermosetting adhesive, along their entire length to the cover member; both employ a permeable outer cover member; and both secure the cover to the outer edges of the pleats in such a way that the pleats are stressed and at least the longer pleats are bowed.

The center tubes of the two filters are of somewhat different construction, the color of the outer wrap is different, and the shape of the perforations in the cover are different.

Both filters are made by a process whereby a paper web, having ribs or grooves extending lengthwise of the web, is pleated on a Chandler pleater, which produces uneven pleats, varying as much as one-sixteenth of an inch or more; a cover member is coated on one entire surface with a thermosetting adhesive and bonded to the outer edges of the pleats. In defendants' process the cover member, with adhesive, is applied to the pleats while the pleats are lying on a flat surface, while in plaintiffs' process, the cover, with adhesive, is applied to the filter element after the element is shaped into a tubular form. In both processes the filters are placed in a side-seam sealer. In the Allied process, radial force is applied to the circumference of the filter when the filter is forced into the cylinder; in the Stone plant, radial force is applied to the circumference of the filter while the filter is in the cylinder. In both processes, the cover is shrunk around and bonded to the pleats, under superatmospheric temperatures.

*Indications That Defendants Were Interested In Going Into the Paper Filter Business Because of the Success of the Stone Filter*

Defendants M & J and Superior sold only cotton waste filters until March, 1961, when they sold their first pleated paper filters. At this time, plaintiffs had been engaged in developing and promoting the Stone filter for more than four years. In fiscal 1960, plaintiffs sold 75,-000 filters at a price of $265,047, and in fiscal 1961, plaintiffs sold 120,000 filters at a price of $443,000. Mr. Hyslop, then in charge of Superior, stated that it was natural for Superior to decide to go into the paper filter business because the waste or sock filter was being challenged. Mr. Simpson testified that during a survey he conducted in 1960 for M & J with regard to paper filters, he concluded that a great amount of new interest was developing in the use of resinated paper in lubricating oil paper, and this interest arose because of the Stone filter, which was then on the market.

In 1959, Mr. Stanley G. Bair, who had interests in both Superior and M & J, arranged to meet Mr. Briggs in Baltimore and proposed that he represent Stone for national sales. A subsequent meeting of Mr. Bair, Mr. Briggs, and Mr. Platt, head of the Stone companies, was held in Washington, D. C., at which meeting Mr. Bair again proposed becoming Stone's national sales representative for the diesel oil filter. Mr. Briggs, however, recommended to Mr. Platt that the proposal be rejected because he felt Mr. Bair might shelve the Stone product, since his principal interest and an important source of income lay in the cotton waste filter.

*Familiarity of Defendants With the Stone Filter*

Mr. M. A. Simpson and Mr. H. E. Hyslop, as stated by defendants in answer to an interrogatory, are the only two persons who have been in charge of or responsible for the engineering of the accused structure.

Mr. Simpson was employed by M & J on April 1, 1960. He became an employee of Allied when it was formed in August, and he worked for Allied until December 31, 1960. Prior to April, Simpson had conducted a survey for M & J regarding the paper filter business to aid in the decision of M & J and Superior regarding going into that field. When he began working for defendants, he had "gone over" the Stone paper filters, and in conversations with Mr. Bair about going to work for M & J,. Simpson and Bair discussed the Stone filter. Mr. McNeily, an officer of Allied and M & J, stated that in 1959, while he was participating in an exploration of the pleated paper filter field, he "very carefully" examined the Stone filter.

The evidence also shows that prior to the time when Allied made its first filters, in December, 1960, Simpson and Hyslop, in October, 1960, attended a meeting of the Chicago Railroad Diesel Club, at which a Stone employee presented a paper describing the Stone filter in detail. Slides were shown of the Stone filter, and samples of the filter were exhibited. Mr. Simpson testified that he was sure he had seen a copy of the paper presented at the meeting and had also read a copy of an advertising leaflet distributed at the meeting, which described the Stone filter and contained the '449 patent number alongside two pictures of the filter.

There was conflicting evidence concerning whether the first Allied filter was made before or after this October, 1960 meeting. (It should be noted in this connection that during all of 1960 only a few experimental filters were made.) Mr. Hyslop, in answer to an interrogatory in evidence stated that the first filter was produced in December, 1960. Mr. Hyslop was President of Allied when he so testified. Simpson testified on direct examination that manufacture of filters began at the Allied plant in September, 1960. Simpson's recollection of dates and other matters was quite unclear, however, and on cross-examination he admitted that he could not testify as to the exact date when the first filters were made, and

that it could have been in December. Subsequently, Mr. McNeily testified that to his best recollection filters were first produced in September, 1960, to be ready for a convention held during that month; however, Mr. McNeily could not remember whether or not he was president of Allied in December, 1960. I consider that Mr. Hyslop's unequivocal statement in answer to the interrogatory carried considerably more weight than does the other testimony with regard to this date.

### Acquisition of Materials by Allied and Prior Study Regarding Materials.

During a preliminary investigation with regard to materials, Mr. Hyslop went to a paper manufacturer and showed them the Stone filter paper to demonstrate the kind of paper he wanted. That manufacturer could not supply it, however, and it was Simpson who made the definitive report to M & J recommending materials and equipment to be acquired.

Early in Simpson's investigation for M & J regarding the paper filter, he spent at least a day at the Blandy Paper Company in Greenwich, New York, consulting with Mr. Long, technical director of Blandy, and during 1960, Long visited the plant and offered his assistance and gave advice to Simpson. Simpson had known Long for nearly thirty years. Long and Briggs have also known one another for many years. Blandy made the paper first used (and still used) in the Stone filter, to Briggs' specifications, and Long had visisted the Stone plant several times a year since 1958.

Simpson and Long discussed filter paper for possible use by Simpson's company. Mr. Long informed Simpson that Blandy was supplying paper for the Stone filter, and the basic weight of the Stone paper was discussed. In Simpson's recommendations to M & J, he suggested the use of a 90 pound paper with a 5 second AC flow rate, after discussion with Mr. Long. The paper being sold to Stone by Blandy was also a 90 pound paper with a 5 second flow rate. Allied subsequently acquired such paper from Blandy and used it in its filters.

Mr. Long recommended that Simpson visit Synco-Resins, Inc., of Bethel, Connecticut, with regard to adhesive for bonding the cover member to the pleats. Synco-Resins was then and is now Stone's adhesive supplier. Simpson testified that he did not recall it if Long told him the company was Stone's supplier. In his prior filter work at National Filter Company, Simpson had bought adhesive from a different supplier. Allied subsequently purchased its adhesive from Synco-Resins.

Mr. Long recommended to Simpson that a curing oven would be necessary to cure the resin impregnated paper, and assured Simpson that he would work along with the curing oven people and M & J on the problem.

Simpson visited a roller coater manufacturer during his investigation; he had not previously used a roller coater at National. Simpson recommended to M & J in his report that a curing oven, a roller coater, and a Chandler pleater be used, and such equipment was acquired.

### Defense of Independent Derivation

Defendants contend that their filter is a result of independent derivation and not imitation of the Stone filter. They say Simpson was hired because of his prior experience with the National filter. Simpson's recommendations, however, the production line set up by him, and the resulting filter produced by Allied bore little resemblance to the National filter or the production methods used at National. The National filter did not use corrugated, resin impregnated paper, as did Stone, but rather a very heavy paper, over 300 pounds in weight. The National lubricating oil filter was made in two sections rather that one; the Stone filter was made in one section. The National filter had adhesive strips at either end and in the middle, instead of over the entire wrap as in the Stone filter, and National did not use a roller coater, but Stone did. The National filter had paper end caps, while the Stone filter had metal end caps (as does the Allied filter). National did not use a Chandler pleater, but Stone did. The National paper was manually pleated, producing even pleats. National had no curing oven, because it did not use resin impregnated paper. Stone used resin impregnated paper and a curing oven to set the resin.

### Conclusion that the Allied Filter Is an Imitation of the Stone Filter

The paper and equipment recommended by Simpson and acquired and used by Allied were essentially the paper and equipment used by Stone. Some of the suppliers were identical. Apparently, the early Allied filter did not use corrugated paper, as the Allied filter tested and compared with the Stone filter in 1961 by Seaboard Airline Railroad did not use corrugated paper. The report of the test found the Allied filter deficient in this respect, and subsequently Allied used corrugated paper.

The Allied filter is strikingly similar to the Stone filter in every significant respect, and the Allied process is likewise similar to the Stone process in every significant respect.

It may be that Simpson and others at M & J, Superior and Allied did not know that some of the process and equipment which Simpson recommended and were subsequently used were the same as used by Stone. But Simpson, Hyslop, McNeily, and Bair were familiar with the Stone filter to begin with and clearly must have realized that the filter engineered by Simpson and Hyslop (principally by Simpson) was the same as the Stone filter in the significant elements.

The conclusion is inescapable that the Allied filter was an imitation of the Stone filter, and the evidence shows that defendants must have been aware that the Stone filter was covered by patents.

### LIABILITY OF THE INDIVIDUAL DEFENDANTS

At the time this litigation was brought, the partners in Superior Diesel Filter Company were Barbara A. Giacobbe (nee Bair), Clara A. Bair, Irwin R. Bair, and Dorothy Bair Nichols.

Defendant Robert W. McNeily was, at the time this litigation was brought, president of M & J, and since that time

he has also become president of Allied. He was president of Allied, too, when it first formed in August, 1960, and for several months thereafter.

■ The evidence is insufficient to warrant a finding of personal liability for infringement on Mr. McNeily's part.

The evidence shows that Mr. McNeily had examined the Stone filter prior to production of the Allied filter and in 1961 discussed with Mr. Duhse of Seaboard the relative merits of the Stone and Allied filters. He placed orders for the materials for the Allied filter and of course, as president had general supervision over production and sale of the filter. These facts, however, are insufficient to establish personal liability on his part. There is no evidence that Mr. McNeily did anything beyond the scope of his duties as an officer of Allied or M & J. Although he must have been aware that the Allied filter was an imitation of the Stone filter, he is not shown to have been a dominant force in the infringement or to have used either corporation for his own wanton and wilful infringement.

In the leading Seventh Circuit case on this point, Dangler v. Imperial Mach. Co., 11 F.2d 945, 947 (7th Cir. 1926), the Court stated as follows:

"(I)n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. The uncertainty surrounding the questions of validity and infringement make any other rule unduly harsh and oppressive.

"It is when the officer acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article *(acts other than as an officer)*, or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability—that officers are held

jointly with the company. The foregoing are by no means cited as the only instances when the officers may be held liable, but they are sufficient for the present case."

See also Weller Mfg. Co. v. Wen Products, Inc., 231 F.2d 795, 801 (7th Cir. 1956); Powder Power Tool Corp. v. Powder Actuated Tool Co., 230 F.2d 409, 414 (7th Cir. 1956); General Motors Corp. v. Provus, 100 F.2d 562 (7th Cir. 1938). No special showing of the kind described in the Dangler case has been made by plaintiffs as regards Mr. McNeily.

■ Mr. Bair and Mr. McGrath were formerly partners in Superior but were not partners therein at the time this litigation was brought. Plaintiffs have not shown, by any evidence, any reason why they should be held liable for infringement of the patents because of their former association with the partnership.

Plaintiffs assert that Mr. Bair controls M & J, Superior, and Allied. While that may be true, there has been no such special showing as described in the Dangler case as would warrant a finding of personal liability. Bair investigated becoming national sales representative for the Stone filter, and he discussed the Stone filter with Simpson while discussing the latter's employment. Like McNeily, Bair must have been aware that the Allied filter was an imitation of the Stone filter. But this evidence does not establish that Bair was a dominating force in the infringement, that he used Allied to shield his own deliberate infringement, or that he devised an irresponsible corporation to engage in infringement.

THE DEFENSE OF LACHES

Defendants maintain that plaintiffs should be barred from enforcing the '449 patent against them because ·plaintiffs permitted, without protest, a large scale infringement by the industry generally prior to defendants' entering into the paper filter business. Defendants state that they set up an entire business and company in reliance upon the freedom of

corrugated paper filters from attack under the '449 patent.

██ The right to enforce a valid patent may be abandoned by permitting a large scale infringement by the industry generally. See, e. g., Eastman Kodak Co. v. McAuley, 41 F.Supp. 873 (S.D.N.Y. 1941). But there is no evidence that any party, not involved in this litigation, has infringed the '449 patent, much less evidence of a large scale infringement.

██ Defendants have the burden of establishing that circumstances justify application of the doctrine of laches. Trico Products Corp. v. Delman Co., 199 F.Supp. 231 (S.D.Iowa 1961).

Defendants point first to the fact that Briggs testified that he had first seen a radially pleated paper filter having a filter element with grooves or corrugations on the market commercially about one year after he applied for the '449 patent. There is no evidence to show, however, that this filter infringed the claims of the '449 patent.

Defendants also point to the fact that corrugated filter paper is sold to the public by certain paper manufacturers, and that in 1960 Mr. McNeily understood that Blandy was selling such paper to several companies for diesel filters. Again, this evidence does not establish that the filter paper was used in such a way as to infringe the '449 patent.

Defendants note that Briggs stated that in 1957 one could obtain corrugated filter paper from Blandy or two or three other manufacturers, but he further stated that this paper was not suitable for diesel filters.

Defendants state that the '449 patent was never enforced against a filter using corrugated paper until the present litigation was brought during the last year of its life. They state that the patent was pleaded in one lawsuit filed in 1950 against Purolator Products, Inc., but the case was dismissed for want of prosecution, and Briggs never collected any royalties from Purolator. This evidence, however, does not establish that Purola-

tor or anyone else has violated the '449 patent.

## DEFENSE OF MISCONDUCT BY PLAINTIFFS

██ Defendants urge various types of misconduct on the part of plaintiffs. They urge, first, that plaintiffs are guilty of misconduct because of a news release issued on July 26, 1962, about three days after the suits were filed against M & J and Superior.

The news release, which is quite succinct, is entirely factual and accurate. It states that Briggs and Stone have filed separate suits against Superior, M & J, and Transportation Filter Co. (a related company that has since been dropped from these proceedings), seeking to enjoin the manufacture and sale of filters under the '449 and '807 patents.

Defendants suggest there is something sinister in the fact that this release was prepared by an advertising agency that does work for the parent company, and in the fact that Mr. Platt, president of Stone, authorized the release. I find nothing unusual in these facts, and certainly nothing suggesting misconduct.

Defendants rely upon Panay Horizontal Show Jar Co. v. Aridor Co., 292 F. 858 (7th Cir. 1923), as holding that it is improper to try patent cases in the newspapers. That case is inapposite. The improper and unfair practices found involved grossly false and misleading advertising.

This issue raised by defendants should not be belabored, because of its lack of merit. It is appropriate, however, to refer to the opinion of Judge Learned Hand in Gillman v. Stern, 114 F.2d 28 (2d Cir. 1940), cert. denied, 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1941) in which he held that certain partially untrue advertising concerning the litigation, the importance of which was trivial, did not establish misconduct on the part of plaintiffs. Judge Hand stated in that opinion:

"The defence is rather a scurvy one at best, and we are not inclined

to lend it an auspicious ear in the case at bar. Of course, a person seeking a court's aid may have so conducted himself that his case reeks too much for any court to entertain it (Keystone Driller Co. v. [General] Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293) no matter from whom it learns the facts. But ordinarily that is not so; ordinarily he has merely made some venial misstatement which influences nobody; then the defence sits especially ill in the mouth of one who is himself an offender, and who seeks by recrimination to continue his invasion of the other's rights, and to avoid restitution. Particularly in actions on patents it has become the favorite gambit of infringers; they pick over the patentee's advertisements—often, it is true, not drawn with scrupulous nicety, as advertisements seldom are—and find, as they frequently can, departures from the untarnished truth. These ought not to give them their escape." 114 F.2d at 32.

In the case at bar, apparently defendants' search of plaintiffs' advertisements was able to produce only something in fact drawn with "scrupulous nicety." Moreover, it isn't even an advertisement.

Defendants urge, next, that the filing of the suits here involved constitutes harassment of defendants. Plaintiffs state there was no reasonable basis for asserting infringement of the '807 patent, because the accused manufacturing methods could not be determined from the filter itself, and the defendants' filter "admittedly" did not have uneven pleats. There is no merit in these arguments; the matter of uneven pleats has been discussed previously in this memorandum, and plaintiffs could certainly surmise that the manufacturing methods probably infringed the method claims of the patent because the article claims were infringed. While there was testimony that another method of producing the filter described in the article claims of '807 might be possible, no witness could suggest another method which would produce the same results.

Finally, defendants complain about certain answers and information supplied to defendants during discovery. I find no improper conduct on plaintiffs' part during the discovery proceedings. With regard to the documents concerning right to sue, there were some which defendants considered might affect that right that plaintiffs have never conceded related to the right to sue, and about which question there could be a genuine dispute. With regard to the interrogatories concerning prior art, again, the parties had different views regarding the significance of certain patents, and the interrogatories were answered on "information and belief." Again, a genuine difference of views was entirely possible in this situation.

## NOTICE OF THE PATENTS

Defendants state that they were given no prior notice of infringement before these proceedings were brought. They also state that plaintiffs produced filters for two years before they began marking the patent numbers thereon.

Stone began marking the numbers of both the '449 and the '807 patents upon both the filters themselves and the cartons in which they were shipped in January or February, 1960. Stone has continued to mark in this manner since that date, except that the '449 marking was discontinued on its expiration and other later issued patents have been added. The marking of both patent numbers thus commenced before defendants made their first filter in December, 1960, and before they sold their first filters in March, 1961.

The patent statute provides as follows:

"Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a

label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." 35 U.S.C. § 287.

There is no requirement in the statute that the patentee begin marking the patent number within any given time after its issue; the penalty of the statute for failing to mark, and failing in the alternative to give actual notice of infringement, is limited to denial of damages for infringement occurring prior to compliance with the statute. Wm. Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., 312 F.2d 385, 386 (6th Cir. 1963); Bros Inc. v. W. E. Grace Mfg. Co., 320 F.2d 594, 599 (5th Cir. 1963). Plaintiffs complied with the statute before defendants commenced infringement.

■ Inasmuch as defendants M & J Diesel Locomotive Filter Corporation, Superior Diesel Filter Company, and Allied Filter Engineering, Inc., have infringed Briggs patent No. 2,395,449 and Briggs patent No. 2,919,807, both good and valid patents, plaintiffs are entitled to an injunction against further infringement by these defendants of the '807 patent, as well as to damages for infringement of both patents, the damages to be determined at a further hearing (and to disbursements and costs in this action).

Judgment will be entered for defendants Robert W. McNeily, J. R. McGrath, and Stanley G. Bair.

This memorandum of decision will stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.